**FHS PROPERTIES LIMITED PARTNERSHIP, etc.,
Plaintiff, Appellee,**

v.

**BC ASSOCIATES, et al., Defendants,
Appellants.**

No. 98–1744.

United States Court of Appeals,
First Circuit.

Heard Dec. 8, 1998.

Decided April 29, 1999.

John D. Donovan, Jr., with whom Randall W. Bodner, Brian G. Murphy, and Ropes & Gray, were on brief for appellants.

Mitchell H. Kaplan, with whom Thomas F. Maffei, Robert DiAdamo, and Choate, Hall & Stewart, were on brief for appellee.

Before SELYA, Circuit Judge, CYR, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

In this diversity case, defendants-appellants BC Associates, et al. ("appellants") [1] appeal a final judgment of the district court, issued in part on a jury verdict and in part as a matter of law. Appellants also challenge the court's denial of their motion for a new trial on damages. We reverse the district court's judgment as a matter of law and affirm the court's denial of the motion for a new trial.

## I. Facts

On appeal, two partners dispute whether a 1991 settlement payment made

---

1. Appellants are: BC Associates ("BCA–1"), BC Phase 2 Associates Limited Partnership ("BCA–2"), and Donald Chiofaro and Theodore Oatis, the general partners of BCA–1 and BCA–2. We will refer to them collectively as "appellants" unless it is necessary to distinguish among them.

to third parties by one of the partners should be characterized under the partnership agreements as a "Deficit Loan" or as an indemnification obligation. Insofar as appellants are challenging the judgment entered against them as a matter of law by the district court, we view the evidence in the light most favorable to them. *See Gibson v. City of Cranston,* 37 F.3d 731, 733 (1st Cir.1994). But insofar as they are challenging the jury's verdict, we view the evidence in the light most favorable to the verdict. *See Dichner v. Liberty Travel,* 141 F.3d 24, 27 (1st Cir.1998). Defendants BCA–1 and BCA–2 (together "BCA") and plaintiff-appellee FHS Properties Limited Partnership ("FHS"), are respectively the managing partners and sole other general partner of two partnerships that developed and now own International Place, a two-tower office complex in downtown Boston. FHS has a sixty-percent interest in the two partnerships. BCA has a forty-percent interest. The partners envisioned developing the complex in two distinct phases and therefore formed Fort Hill Square Associates ("Partnership 1") to develop Phase 1 of the project and Fort Hill Square Phase 2 Associates ("Partnership 2") to develop Phase 2.[2] The partners signed two partnership agreements ("Partnership Agreements"), essentially identical in their terms, which provided that the agreements would be construed in accordance with Massachusetts law.

Phase 1 of the project was initially financed through a construction loan from Bank of Boston. When construction was complete, the construction loan was "taken out" and replaced with permanent financing by Teachers' Insurance and Annuity Association ("TIAA"). When the partners decided to proceed with Phase 2, Bank of Boston again agreed to finance the construction, subject to a permanent "take out" commitment from TIAA. The second construction loan was secured by all of the partnerships' assets, including a mortgage on Phase 1. Notwithstanding its security interest, Bank of Boston, in May 1990, approved a plan to distribute $15 million of partnership cash to the partners on three future distribution dates, provided that certain conditions were satisfied on those dates.

The settlement obligation at issue in this case arose in January 1991, when two entities, who were then limited partners of BCA–1 and who shared an interest in Phase 1 but not Phase 2 of the project, sued defendants Partnership 1, BCA–1, FHS, Donald Chiofaro, Theodore Oatis, Bank of Boston, and TIAA, claiming that the general partners of BCA–1 had misused partnership assets by pledging them as security for the construction of Phase 2 (the *"Dimeo"* suit). The initiation of the suit distressed the partnerships' lenders. Bank of Boston sought an assurance from TIAA that notwithstanding the pendency of the suit, it would honor its promise to pay off the bank's construction loan and replace it with permanent financing once Phase 2 was complete. TIAA refused to give such an assurance. Bank of Boston responded by threatening to cease financing Phase 2 construction and insisted that the partnerships sign a "Forbearance Agreement," which became effective on March 14, 1991. That agreement stated that it would be an event of default under the construction loan if the *Dimeo* suit was not settled by April 15, 1991; and pending the April 15 deadline, the bank would finance only fifty percent of the requisitions made under the loan agreement, forcing the partnerships to cover the balance from other funds, which could potentially include the $15 million earmarked for distribution.

Not surprisingly, BCA and FHS jointly worked to resolve the *Dimeo* suit by the April 15 deadline. They negotiated on multiple occasions with the *Dimeo* plain-

---

**2.** BCA–1 and FHS are the general partners of Partnership 1; BCA–2 and FHS are the general partners of Partnership 2.

tiffs' lawyers and met with Bank of Boston and TIAA in an effort either to borrow funds with which to settle the suit or to eliminate the terms of the Forbearance Agreement. On each occasion, the lenders refused to lend the necessary money or to change the terms of the Forbearance Agreement.

On April 12, 1991, the last business day before the bank's deadline, BCA and FHS reached an oral agreement with the *Dimeo* plaintiffs to settle the suit for $5.6 million. Payment was due in one week, on April 19. The partners promptly informed Bank of Boston and TIAA that the case had been resolved. On April 18, however, FHS informed BCA, by notice to BCA's general partner Chiofaro, that BCA was forbidden from using Partnership 1 or Partnership 2 funds to satisfy the settlement, and threatened to remove BCA as managing general partner should it do so. FHS added that it would notify Bank of Boston and TIAA of its position. According to FHS, partnership funds could not be used to pay the settlement because the settlement was solely BCA's obligation.

After deliberating through the evening of April 18, Chiofaro decided on the morning of April 19 to use only BCA funds to pay the settlement.[3] That day, he paid the *Dimeo* plaintiffs $5.6 million. In return, the *Dimeo* plaintiffs forfeited to BCA their small, indirect equity interests in Phase 1, represented by the limited partnership interests in BCA–1.

Section 5.2 of the Partnership Agreements permits a partner to lend the partnerships certain amounts as "Deficit Loans" if four conditions are met: (1) there must exist a "financial requirement" of the partnership, that (2) "cannot ... reasonably be satisfied from partnership capital, additional capital, financing proceeds, revenues and other partnership

moneys," (3) "the parties [have] use[d] their best efforts to obtain reasonable non-recourse institutional financing ... of the required amounts" but have been unable to "obtain such financing," and (4) a partner has "elect[ed] ... in its sole discretion" to loan the partnership the "necessary funds." In November 1991, some six months after satisfying the *Dimeo* settlement, BCA sent a letter to FHS, asserting that its settlement payment constituted a "Deficit Loan," accruing interest at 18%. FHS responded that no such Deficit Loan had been made, and that BCA was not entitled to indemnification for any part of the $5.6 million payment. FHS then filed the instant action seeking a declaration that neither Partnership 1 nor Partnership 2 owed any sum to BCA.

## II. Prior Proceedings

The parties tried the case to a jury over twelve days beginning October 14, 1997. Although denominated defendants, appellants assumed the burden of proof and proceeded through trial effectively as plaintiffs. Upon the close of appellants' evidence, FHS moved for judgment as a matter of law on the Deficit Loan issue, contending that the second requirement of Section 5.2 had not been met because "[t]here can be no question before the jury that the partnership[s] had money with which to pay this obligation." The court reserved ruling on the motion and submitted the question to the jury. The district court also instructed the jury on damages, advising that damages should reflect the $5.6 million settlement payment made by BCA, less the value of any benefits obtained by it, including the limited partnership interests in Phase 1 obtained in the settlement and the value, if any, of the release from the lawsuit. Appellants did not object to this instruction:[4]

---

3. Chiofaro actually used his and Oatis's personal funds to pay the settlement. All parties, however, appear to consider the payment to have been made by BCA for purposes of the Deficit Loan issue.

4. Although appellants contend that they objected to the submission of the "release" valuation to the jury, we can find no such objection in the record. *See infra* at Part III(B).

After deliberation, the jury answered special interrogatories establishing that appellants had proved each of the four conjunctive elements for a "Deficit Loan;" and alternatively, that appellants were entitled to be indemnified by the partnerships for the settlement payment. Following the return of the special verdict, the court gave a number of additional instructions on damages. In the end, the jury returned a verdict establishing appellants' damages at $2.1 million.

Following the jury's verdict, FHS renewed its motion for judgment as a matter of law and appellants filed a motion for a new trial on damages. The court, on May 13, 1998, entered final judgment, ruling that a Deficit Loan did not exist under the partnership agreements as a matter of law and that appellants were only entitled to indemnification. According to the court, "the facts established at trial show that the *Dimeo* suit could reasonably have been paid from partnership funds." Additionally, the court denied appellants' motion for a new trial. In the end, the court entered judgment awarding appellants indemnification payments in the amount of $2.1 million accruing interest at 6% per annum. By contrast, as a Deficit Loan, the amount the partnerships owed appellants would have accrued interest at 18% per annum.[5]

Appellants appeal both the judgment as a matter of law and the denial of their motion for a new trial.

### III. Discussion

#### A. Judgment as a Matter of Law

■■■ We review a district court's granting of judgment as a matter of law *de novo*. *See Correa v. Hospital San Francisco*, 69 F.3d 1184, 1191 (1st Cir.1995). "A judgment as a matter of law may be granted only if the evidence, viewed from the perspective most favorable to the non-movant, is so one-sided that the movant is

plainly entitled to judgment, for reasonable minds could not differ as to the outcome." *Gibson*, 37 F.3d at 735. In considering the evidence, we, like the district court, "cannot evaluate the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of evidence." *Criado v. IBM Corp.*, 145 F.3d 437, 441 (1st Cir. 1998) (citation and internal quotation marks omitted).

During trial, appellants contended that the partnerships' admittedly plentiful funds were not reasonably available to pay the *Dimeo* settlement because of restrictions imposed by the loan agreements. Appellants also argued that FHS's refusal to permit BCA to use partnership funds further hindered these funds from being reasonably available.

The court, however, rejected these theories as a matter of law because it regarded as undisputed two facts: (1) Bank of Boston had permitted Partnership 1 to distribute up to $15 million to the partners and this money could have been used to fund the settlement; and (2) Chiofaro's and Oatis's testimony that before FHS's objection on April 18, 1991, they intended to pay the settlement from partnership funds without obtaining bank approval demonstrated that loan restrictions did not hinder the use of funds. The court additionally found that FHS's refusal to permit the use of partnership funds was irrelevant because BCA, as managing general partner, had the authority to settle the lawsuit with partnership funds regardless of FHS's position.

■■■ Reviewing the record in the light most favorable to appellants, we disagree with the district court's assessment of the evidence as undisputed. In our view, the jury verdict was adequately supported by appellants' evidence that partnership funds were not reasonably available because of

---

5. A further difference between a Deficit Loan and indemnification obligation is that a Deficit Loan shall be secured by mortgages on Phase 1 and Phase 2 to the extent permitted by other financing obligations. Moreover, there can be no distributions to any partner while a Deficit Loan remains outstanding.

loan restrictions and FHS's lack of cooperation. The partnerships' loan documents provided that all of the partnerships' assets served as collateral for the construction loan. Specifically, section 14(c) of the Construction Loan Agreement and the related Pledge and Escrow Agreement of Cash Account stated that Bank of Boston had a security interest in all of the partnerships' assets and that neither partnership could apply funds for any purpose without bank consent. Witness testimony further supported this documentary evidence: Chiofaro and Oatis testified that funds could not be used to pay the settlement without bank permission, which was not forthcoming; and Coleman Benedict, an FHS representative, testified that the partnerships did not have enough free cash to fund the settlement.

It is true that Bank of Boston authorized the disbursement of $15 million to the partners, but appellants introduced evidence that these funds were not reasonably available to pay the *Dimeo* settlement. Fifteen million dollars had been earmarked for distribution on three dates: $8 million on June 5, 1990, $3 million six months thereafter, and $4 million six months thereafter. According to loan documents and Oatis's testimony, these earmarked funds could not be distributed without bank approval on each disbursement date.[6] Moreover, according to Oatis, the earmarked funds were not sufficient on April 19, 1991 to pay the $5.6 million settlement. Eight million dollars had already been distributed to the partners as of the first release date and therefore were no longer part of the partnership assets. The next $3 million were not distributed on the scheduled second disbursement date because that amount had been used to fund fifty percent of the Phase 2 construction expenses during the pendency of the Forbearance Agreement. Finally, the last $4 million were earmarked for distribution in May 1991, after the settlement payment was due. While BCA theoretically could have used the $4 million in anticipation of the forthcoming release date, the jury could have found that FHS's threats, as well as uncertainty regarding the bank's required consent, rendered the funds not reasonably available on April 19, 1991. In all events, simple arithmetic proves that $4 million is not $5.6 million.

We also disagree with the district court's decision that Chiofaro's and Oatis's testimony that they had initially intended to pay the settlement from partnership funds without obtaining bank approval is conclusive evidence that bank restrictions did not encumber partnership funds. While such testimony tends to prove that partnership funds were reasonably available, it is not conclusive evidence on this point. The jury could have credited Oatis's testimony that he did not intend to obtain bank permission before April 19 because it was not until that date that he realized the distribution of funds necessary for payment could not occur without FHS's cooperation.

The testimony introduced at trial therefore sufficiently supported the jury's finding that funds were not reasonably available to settle the *Dimeo* suit on April 19, 1991.[7] Under these circumstances, the

6. FHS contends that bank authorization was not required for the distributions. The loan documents, however, indicate to the contrary.

7. FHS contends that there are two additional reasons that a Deficit Loan did not exist as a matter of law: (1) Section 5.2 of the Partnership Agreements states that any Deficit Loan "shall be evidenced by notes of the Partnership" and no such note exists; and (2) Section 5.2 provides that "[w]hile any Deficit Loans remain outstanding, there shall be no distributions of any nature ... to any part-

ner," and BCA violated this provision by distributing funds to the partners on April 22, 1991. We reject FHS's argument. In denying FHS's motion for summary judgment, the district court correctly ruled that under the terms of the Partnership Agreements, these two provisions were not conditions for the creation of a Deficit Loan. *See Canal Elec. Co. v. Westinghouse Elec. Co.*, 973 F.2d 988, 992 (1st Cir.1992) (when no facts are in dispute, the interpretation of a contract is a question of law for the court).

district court erred in ruling as a matter of law that the conditions for a Deficit Loan had not been met. Thus, we reverse the court's judgment as a matter of law, reinstate the jury's finding that the conditions for a Deficit Loan were met, and remand so that judgment may be entered in accordance with this opinion.

## B. Motion for New Trial

■ Appellants also challenge the district court's refusal to grant a new trial on damages, contending that the court's instructions to the jury on damages were erroneous and alternatively, that the jury's valuation of their damages at only $2.1 million is not supported by the evidence. We review the court's denial of a motion for a new trial for an abuse of discretion. See *Air Safety v. Roman Catholic Archbishop of Boston,* 94 F.3d 1, 4 (1st Cir. 1996).

According to appellants, the district court erred in instructing the jury that it could deduct the value of the limited partners' release from its base damages when there was no evidence of the value of the release in the record. See *Kelliher v. General Transp. Serv., Inc.,* 29 F.3d 750, 754 (1st Cir.1994) (jury instruction may not be given if there is insufficient evidence to support it).

■ Appellants, however, did not preserve this argument for appeal. Fed. R.Civ.P. 51 states, in relevant part, that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."

■ Although appellants contend that they objected to the jury instruction and further submission of the issue, we have been unable to discern any such objection. Rather, our reading of the record indicates that appellants failed to object when the court, at the close of the evidence, instructed the jury:

> In calculating damages, I instruct you that the base figure on which your calculation is made is the 5.6 million paid to settle the suit. From that amount, you should deduct the value, if any, of the assets which you find that Chiofaro purchased from [the limited partners] in settlement of the suit, that is, what you find to be the value, again, if any, of the 22½ percent interest in the BCA[–1] partnership, as well as the value of the release given Chiofaro by [the limited partners].[8]

Appellants also failed to object when the jury, after a period of deliberation, requested by note that the court "supply parameters 'for the value of the release.'" Appellants' assertion that during a resulting lobby conference, they "stated that there existed no testimony in the record as to the value of the release [and] objected to additional instruction concerning the value of the release and to further submission of the issue to the jury" misstates the record. During the lobby conference, the court asked the parties whether there was testimony on the value of the releases. Counsel for appellants responded: "The only testimony, I believe, was opinion testimony on the value of the interest. So subtraction works, but I think that's unfair." Counsel did not, however, object to the court's instructing the jury to subtract the value of the release from the $5.6 million base figure. Rather, the only so-called objection noted by counsel at that time was "[y]ou've got to repeat your [earlier] instruction and say the evidence is the evidence." These comments, together, fall short of Rule 51's requirement that the objection "stat[e] distinctly the matter objected to and the grounds of the objection."

**8.** During trial, the court referred to both BCA and Donald Chiofaro as "Chiofaro." Here, it seems to be referring to BCA.

Absent a timely objection, an erroneous jury instruction warrants a new trial only where the assigned error " 'caused a miscarriage of justice or ... undermined the integrity of the judicial process.' " *Play Time, Inc. v. LDDS Metromedia Communications, Inc.,* 123 F.3d 23, 29 (1st Cir.1997) (quoting *Scarfo v. Cabletron Sys., Inc.,* 54 F.3d 931, 940 (1st Cir.1995)). We see no miscarriage of justice here and therefore hold that appellants have waived their objection to the jury instruction. *See, e.g., Play Time,* 123 F.3d at 30, n. 8 (no miscarriage of justice where the issue "implicates only the question of damages for breach of a private agreement between the litigants;" and no damage to integrity of the judicial process where "the proceedings below were conducted with meticulous attention to the rights of both parties").

Appellants also make the argument that even if the value of the release played no role in the jury's reduction of its recovery—so that the $3.5 million reduction represents the value of limited partnership interests only—they are still entitled to a new trial on damages because the jury's valuation is not supported by the record. In challenging the jury's damage award, appellants face a daunting task. Our review "is limited to examining whether evidence in the record supports the verdict. If the jury award has a rational basis in evidence, we must affirm it." *Air Safety,* 94 F.3d at 4 (citation and internal quotation marks omitted). "While 'the jury may not render a verdict based on speculation or guesswork,' a reviewing court will not tinker with the jury's assessment of money damages as long as it does not fall outside the broad universe of theoretically possible awards that can be said to be supported by the evidence." *Dopp v. Pritzker,* 38 F.3d 1239, 1249 (1st Cir.1994) (citation omitted). In the end, "[w]e will not disturb an award of damages for economic loss provided it does not violate the conscience of the court or strike such a dissonant chord that justice would be denied were the judgment permitted to stand." *Vera–Lozano v. Int'l Broadcasting,* 50 F.3d 67, 71 (1st Cir.1995) (citation and internal quotation marks omitted).

Here, the jury's valuation of the limited partnership interests falls within the broad universe of awards supported by the evidence. Together, the limited partners had a 22.5% interest in BCA–1, which in turn had a 40% interest in Phase 1. Thus, the limited partners had a 9% interest in Phase 1. Oatis testified during trial that, in 1989, he prepared for FHS a valuation of Phase 1 for $150 to $200 million. Using the 9% figure, the limited partnership interests in this amount would have been $13 to $18 million. Francis McCarthy, former comptroller of Chiofaro Company, one of Chiofaro's interests, testified that, some time after August 1990, Chiofaro asked him to calculate certain tax consequences of acquiring one of the limited partner's interest at purchase prices ranging from $1.96 to $4 million. The jury could have determined that this testimony reflected a proper valuation of one of the limited partner's interest. Appellants themselves introduced into evidence a letter from Richard Renehan, lead trial counsel for defendants in *Dimeo,* to Earl Cooley, counsel for plaintiffs, stating that defendants were "prepared to buy your clients out for cash at the fair market value of their interests" and offering $1.6 million. Kevin Currier, the Chief Financial Officer of Dimeo Construction Company ("Dimeo"), a limited partner with a 20% interest in BCA–1, testified that, based on this letter, he valued the sale of Dimeo's interest at $1.5 million on Dimeo's 1991 tax return (and the IRS challenged this valuation as insufficient). Finally, Coleman Benedict testified that during settlement negotiations he discussed with Chiofaro the limited partners' interest at values ranging from zero to $15 million, depending on "assumptions you used about the condition of the market in the future." Based on the sum of this evidence, the jury could have reasonably val-

ued the limited partnership interests in BCA–1 at $3.5 million. We will not second-guess its decision to do so.

### IV. Conclusion

For the foregoing reasons, we *affirm* the decision of the district court in part and *reverse* in part, and *remand* to the district court for proceedings consistent with this opinion. No costs.