BOWNES, Senior Circuit Judge
(concurring in part, dissenting in part).
I concur with Part 11(C) of the majority’s opinion regarding Calefs state law claim. I write separately, however, because I disagree with the majority’s analysis of the Americans with Disabilities Act (“ADA”). I must acknowledge that Fred Calef is not the most sympathetic ADA plaintiff. As the majority points out, he threatened to hit a 60 year old woman and scared a Gulf War veteran. This court, nevertheless, has a duty to remain faithful to our precedent and the relevant laws applicable to this case. We should take extra care not do more harm than good where the plaintiff is not a nice person. We must make sure that our opinion does not create bad precedent from which all future plaintiffs will suffer. I am concerned that is what is happening here. I must therefore respectfully dissent.
At the heart of my concern is that the majority does not adequately address the relevant Equal Employment Opportunity Commission (“EEOC”) regulations. Until now, every case in this circuit that has revolved around the issue of whether a plaintiff was “substantially limited” in a major life activity has used the EEOC regulations for guidance. At times, the majority misapplies the EEOC regulations. At others, the majority does not use them at all. I believe we should follow our past practice of using the EEOC regulations for guidance and apply them to this case.
I also dissent because the majority’s analysis places emphasis on facts that are entirely irrelevant under our case law. Those facts involve the subjective fear felt by the Gillette nurses and Calefs immediate supervisor. Their fear is a theme that runs throughout the majority’s opinion. It is mentioned in the very first sentence of the opinion, and then again at least eight times in the majority’s fact section alone. Unfortunately, the majority treats fear as more than just a theme. The majority, incorrectly in my view, incorporates fear directly into its analysis of whether a person is “otherwise qualified.” To make matters worse, the majority’s “otherwise qualified” analysis is complete dicta. Having found that Calef was not disabled under the ADA, there is simply no reason for the majority to expound on whether he was “otherwise qualified.” Because I do not consider it wise to make unnecessary pronouncements on the law, and because I believe the substance of the majority’s “otherwise qualified” analysis is incorrect, I must dissent.
Lastly, I dissent because the majority opinion is not faithful to the summary judgment standard. Under that standard, we are to examine the facts in the light most favorable to the nonmovant, Calef, drawing all reasonable inferences and resolving all factual conflicts in his favor. See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 18 (1st Cir.1999). A motion for summary judgment should only be granted if “the evidence, viewed from the perspective most favorable to the non-mov-ant, is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome.” FHS Props. Ltd. P’ship v. BC Assocs., 175 F.3d 81, 85 (1st Cir.1999) (citation omitted). In its description of the facts, the majority fails to cite certain material evidence that is beneficial to Calef. Based upon these omissions, as well as *89 those facts which are discussed, it is my view that reasonable minds could differ as to the outcome of this case. The majority’s claim that reasonable minds could not differ is undermined by the fact that the district court judge in the proceedings below ruled that Calef was disabled.
I. BACKGROUND
A. Facts
Much of the evidence that the majority fails to take into account relates to the events leading up to and during December 6, 1996. In mid-1996, Calef was assigned to work on new computerized machines in a high traffic area of Gillette’s production facility. Calef was upset by the new assignment and told one of his supervisors, Frank Sciarini (“Sciarini”), that he could become sick because of the stress of working on the new machines. Calef also spoke with his psychologist Dr. Janis Soma (“Dr. Soma”) about the problem. On May 24, 1996, Dr. Soma wrote a note to Gillette’s medical department requesting that Calef be re-assigned to machines he had previously worked on. Dr. Soma also advised Gillette that Calef was at serious risk for significant health problems and that maintaining a familiar work environment would be helpful. Calef took the note to work and showed it to a nurse in the medical department. Calef also showed the note to Sciarini. Sciarini read the note and Calef told Sciarini that he had ADHD, but Sciarini refused to reassign him. Calef also took the note to Sciarini’s supervisor, Joe Donovan (“Donovan”), who was the Gillette manager that ultimately decided to terminate Calefs employment. Donovan read the note and Calef told Donovan that he had ADHD, but Donovan also refused to reassign him.
On December 5, 1996, Calefs supervisor Steve Pennington (“Pennington”) asked for volunteers to work the coming Sunday. Calef expressed an interest in working, but did not make a firm commitment. On December 6, 1996, Calef had a disagreement with his supervisors about a machine on which Calef had worked. After the disagreement ended, Calef informed Pennington that he would not work on Sunday. Calef said that he had already worked the two previous weekends and could not find a babysitter for his children. An argument promptly erupted, with Pennington yelling at Calef for refusing to work on Sunday.
Pennington reported to his immediate supervisor, Sciarini, that Calef was “acting strange again like he was not taking his medication again.” Sciarini took Calef into an office and yelled at him for refusing to work on Sunday. Sciarini believed that Calefs behavior “was out of control and his facial expressions were irrational.” Sciarini asked Calef “if he was still under counseling and taking his medication.” Sciarini also suspected that Calef might be using illegal drugs and demanded that Ca-lef report to the company nurse and submit to a blood test. Calef went to the nurse’s office, but refused to take the blood test. At the nurses office, Sciarini described Calef as “rambling and incompetent.” Calef admits that he was incoherent and could not follow instructions. The two nurses on duty said Calef had difficulty following instructions, paced back and forth, and kept repeating the same questions. One nurse said that Calefs concentration was so poor that they had to explain certain policies to him a total of five times. The nurses also had to repeatedly instruct Calef how to fill out simple paperwork, including signing his own initials. One nurse described the situation as follows:
Mr. Calef was unable to focus his thoughts and became more and more agitated. Mr. Calefs face was red, he *90 was speaking quickly and in a raised voice, and he kept saying that the problem was not with him, but with his supervisors, Mr. Sciarini and Steve Pennington.
At no time did Calef become violent or threaten anyone with violence. Calef eventually agreed to take the blood test when a nurse explained that he could be fired if he continued to refuse. After taking the blood test, Calef was sent home, placed on medical leave, and instructed to remain at home until the results of the blood test were known. Although the blood test results came back negative for illegal drugs, Gillette sent Calef a telegram on December 13, 1996, stating that his employment had been terminated for “refusal to work scheduled overtime and failure to cooperate with your group leader and supervisor.”
In December, 1997, Dr. Soma referred Calef to the Massachusetts General Hospital Learning Disorders Unit to undergo a battery of psychometric tests. On the day of the tests, Calef had taken Ritalin for his ADHD. The tests consisted of several sub-tests designed to measure his intelligence, attention, auditory and visual functions, and his academic abilities. Calef scored within the average range on some of the subtests, but scored far below the average on others, including subtests designed to measure his resistance to distraction, awareness of visual detail, and verbal abilities. The Learning Disorders Unit concluded from the tests that “attention deficit is an important cognitive handicap for this otherwise normally intelligent gentleman.”
There are other facts that the majority fails to discuss and these will be addressed below at the appropriate time.
B. Procedural History
The majority also does not discuss the procedural history of this case or the district court’s rulings below. Calefs complaint in the district court alleged that Gillette failed to reasonably accommodate his ADHD and that Gillette terminated his employment because of his disability in violation of the ADA. Calef claimed he was disabled because ADHD substantially limited the major life activities of learning and speaking, including communicating, thinking and concentrating, and that his ADHD worsened under stress.
The district court, in a ruling issued from the bench, granted Gillette’s motion for summary judgment. The district court found Calef to be disabled within the meaning of the ADA as to the major life activity of “speaking while under stress.” Nevertheless, the district court determined that summary judgment was proper because there was no evidence that Gillette knew of Calefs disability, no evidence that Calef sought a reasonable accommodation for his disability, and no evidence of discriminatory animus on the part of Gillette. The district court further held that Calefs disability arose from the stress of his job, which therefore made him not “otherwise qualified” as required by the ADA.
II. THE MAJORITY’S MISAPPLICATION OF THE EEOC REGULATIONS
The ADA prohibits an employer from discriminating against a qualified individual because of that person’s disability. 42 U.S.C. § 12112(a). To survive on summary judgement, Calef must produce enough evidence from which a reasonable jury could conclude that he was disabled within the meaning of the ADA, that with or without reasonable accommodation he was able to perform the essential functions of the job, and that Gillette terminated his employment, in whole or in part, because *91 of his disability. See Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir.2002); Criado v. IBM Corp., 145 F.3d 437, 441 (1st Cir.1998). The ADA defines the term “disability” as “a physical or mental impairment that substantially limits one or more of the major life activities of such individual.” 42 U.S.C. § 12102(2)(A). I respectfully disagree with the majority’s analysis of whether Calef is “substantially limited” in a major life activity.[12] First, I believe the majority misreads the relevant EEOC regulations, which this court has repeatedly used for guidance in determining if an individual is “substantially limited.”
The EEOC regulations interpreting the ADA define “substantially limited” to mean either: “(i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.” 29 C.F.R. § 1630.2(j)(l) (emphasis added). With respect, I believe the majority misconstrues the differences between these two prongs and thereby sows confusion for future litigants.
The majority contends that Calef is not substantially limited in speaking or learning. As far as speaking is concerned, the majority says that Calefs psychometric tests show he possesses the verbal abilities of an average person. The majority also points to Calefs own deposition testimony that he successfully speaks face-to-face, as well as over the telephone, with customers and supervisors as part of his new job repairing household appliances. As for learning, the majority highlights the undisputed fact that Calef obtained his General Equivalency Diploma, took other courses, and received on-the-job training. Put simply, the majority’s argument is that Calef can learn and speak, and therefore cannot be considered “substantially limited” for purposes of the ADA.
I agree with the majority that the record is replete with evidence that Calef can actually speak, and can actually learn. I therefore agree that Calef does not meet the first prong of the EEOC regulations. See 29 C.F.R. § 1630.2(j)(l)(i). This brings me to the second prong of the regulations. The majority says that Calef does not meet the second prong because “[tjhere is no evidence that Calef could not learn or speak during the activities of everyday life.” I respectfully submit that this reasoning is illogical. In essence, the majority is saying that Calef does not meet the second prong of the EEOC guidelines because he does not meet the first. Under the majority’s view, the analysis should be confined only to what Calef can and cannot do. This necessarily means ignoring the second prong of the EEOC regulations, which recognizes that a person who accom *92 plishes major life activities can nevertheless be “substantially limited” if they are significantly restricted as to the condition, manner or duration under which they perform those major life activities, as compared to the average person in the general population. See id. § 1630.2(j)(l)(ii).
The constricted analysis the majority adopts is unsupported by Supreme Court precedent and inconsistent with our prior opinions. The Supreme Court has stated that the ADA “addresses substantial limitations on major life activities, not utter inabilities,” and that “[w]hen significant limitations result from the impairment, the [disability] definition is met even if the difficulties are not insurmountable.” Bragdon v. Abbott, 524 U.S. 624, 641, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). This court has also recognized that an impairment can “substantially limit” a person’s major life activities, even though it is possible for that person to actually engage in those activities. See Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 22 (1st Cir.2002).
In Gillen, a woman with an amputated arm wanted to be an emergency medical technician (“EMT”), but the defendant-employer would not hire her because it claimed she could not lift a certain amount of weight. 283 F.3d at 19. The woman then obtained a different EMT job with another employer, and in doing so, demonstrated her ability to lift the amount of weight that the defendant originally claimed she could not lift. In a suit by the woman against the first employer, the district court found that the woman was not disabled under the ADA because by demonstrating that she could lift the required amount of weight, she had shown that she was not “substantially limited” in a major life activity. We disagreed, and held that the woman’s amputated arm represented a substantial limitation on her ability to lift, “notwithstanding her extraordinary efforts to compensate for her impairment.” Id. at 23. We explained that “[t]he key question is not whether a handicapped person accomplishes her goals, but whether she encounters significant handicap-related obstacles in doing so.” Id. at 22.
The majority’s analysis of the EEOC guidelines is flawed for another reason. To decide whether a plaintiff is “substantially limited,” be it under the first or second prong of the EEOC regulations described above, the EEOC regulations state that three factors should be considered. 29 C.F.R. § 1630.2(j)(2).' Those three factors are: the duration or expected duration of the impairment; the nature and severity of the impairment; and the long-term impact or expected long-term impact resulting from the impairment.[13] See id. Time-and-again we have used these three factors as guidance to determine whether a plaintiff is “substantially limited.” See Gonzalez v. El Dia, Inc., 304 F.3d 63, 73 (1st Cir.2002); Carroll, 294 F.3d at 239; Gillen, 283 F.3d at 21; Navarro, 261 F.3d at 98; Whitney, 258 F.3d at 33; Santiago Clemente, 213 F.3d at 30-31; Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 10 (1st Cir.1999); Criado, 145 F.3d at 442; Soileau v. Guilford of Me., Inc., 105 F.3d 12, 15 (1st Cir.1997); Katz v. City Metal Co., Inc., 87 F.3d 26, 31 (1st Cir.1996). We have done so because the regulations “constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.” Santiago Clemente, 213 F.3d at 30 n. 2 (quoting Bragdon, 524 U.S. at 642, 118 S.Ct. 2196). The majority, however, does *93 not cite or discuss these three factors. Moreover, the majority does not explain to future litigants why it chooses not to apply the three factors, or what considerations take their place. In light of the fact that neither Calef nor Gillette challenges the EEOC regulations, we should continue our well established practice of relying on them for guidance.[14]
I close this portion of my dissent with one final observation of the majority’s “substantially limited” analysis. The majority says that the Supreme Court’s opinion in Toyota requires that we examine Calefs speaking and learning both “outside the workplace as well as within.” This is a subtle but profound expansion of Toyota’s holding. In Toyota, the Supreme Court stated:
When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people’s daily lives, not whether the claimant is unable to perform the tasks associated with her specific job.
534 U.S. at 200-01, 122 S.Ct. 681 (emphasis added). The Court went on to reject the notion that “whether an impairment constitutes a disability is to be answered only by analyzing the effect of the impairment in the workplace.” Id. at 201, 122 S.Ct. 681. It seems evident that these sentences are the basis for the majority’s conclusion that Calefs speaking and learning must be examined outside the workplace as well as within. But that conclusion does not fully consider the reasoning behind the Supreme Court’s holding in Toyota. As the Court explained, the “critical[ ]” reason behind its decision was that “the manual tasks unique to any particular job are not necessarily important parts of most people’s lives.” Id. In contrast, there is no doubt that speaking and learning are central to most people’s daily lives. See Whitney, 258 F.3d at 33 (learning); Santiago Clemente, 213 F.3d at 30 (speaking).
I respectfully submit that extending this portion of the Court’s holding in Toyota to other types of major life activities, such as speaking and learning, is unwarranted. Doing so means that people with learning disabilities will now be required to produce evidence that shows their learning is impaired at work and at outside of work. Failure to produce both types of evidence will result in dismissal of their claim on summary judgment. This onerous requirement conflicts with the recognition that a plaintiffs evidence “need not necessarily be composed of excruciating details as to how the plaintiffs capabilities have been affected by the impairment.” Gillen, 283 F.3d at 24 (citing Albertson’s, Inc. v. Kirkingburg, 527 U.S. at 555, 566, 119 S.Ct. 2162).
III. THE MAJORITY’S MISAPPLICATION OF THE FACTS TO THE LAW
This brings me to my concern regarding the majority’s description of the evidence in this case. The majority fails to discuss certain relevant facts that are beneficial to Calef, which is required at the summary judgment stage. See Conward, 171 F.3d at 18. These omitted facts pertain mostly to Calefs behavior on December 6, 1996, although there are others. Considering these omitted facts through the prism of *94 the three EEOC factors, it seems clear to me that a reasonable jury could find that, despite taking Ritalin and undergoing therapy, ADHD substantially limited the condition, manner, or duration of Calefs learning and speaking. Specifically, Calef has presented evidence that his impairment was of significant duration, that his impairment was at times severe, and that the impairment’s impact was long-term.
Calef has presented evidence that his ADHD is an impairment of significant duration. See 29 C.F.R. § 1630.2(j)(2)(ii). Calef testified that ADHD affected him when he was young and made it difficult for him to do school work. In addition, Dr. Soma stated in her affidavit that it was her opinion that Calefs learning difficulties extended back to his time in school. Even more significant is Calefs testimony that, in the years following his employment at Gillette when he was not taking Ritalin, his concentration was so poor that he could not read more than one or two paragraphs without losing complete focus. My conclusion regarding the duration of Calefs impairment comports with our previous characterization of ADHD as “a permanent disability.” See Criado, 145 F.3d at 442.
Second, Calef produced evidence that his impairment, at least at times, was severe. See 29 C.F.R. § 1630.2©(2)(i). The set of statements by Calefs supervisors and the nurses describing the December 6, 1996, incident demonstrate that Calef had significant concentration problems. The two nurses reported that Calef “was unable to follow simple directions.” They claimed that Calef “[rjepeatedly had to be redirected on what to do and why,” even for matters as basic as signing his initials. In fact, the nurses had to explain some procedures to Calef five times. Calefs supervisors confirmed the nurses’ observations, stating that “Fred’s behavior was erratic. He was unable to follow simple commands and to focus his thoughts when questioned.” Moreover, all parties agree that Calefs speaking was incoherent, that he rambled and repeated the same questions over again.
Lastly, Calef submitted evidence that the impact of his impairment was long-term, even when taking Ritalin. See 29 C.F.R. § 1630.2(j)(2)(iii). Calef testified that, despite taking Ritalin, he had difficulty concentrating on repairing machinery at work, had difficulty reading the company bulletin board, and would blurt out or interrupt people during conversations. These difficulties occurred before the incident on December 6, 1996. In addition, the psychometric tests, which were administered almost a year after Gillette terminated Calefs employment, and conducted on a day that Calef had taken Ritalin, indicate that the impairment’s impact was long-term. The test results show that Ca-lef scored within the average range on some subtests, but far below the average on others. His below average performances involved subtests designed to measure his attention, concentration and verbal abilities.[15] As a result, a doctor at Massachusetts General Hospital concluded that “these test scores confirm the clinical *95 impression that attention deficit is an important cognitive handicap for this otherwise normally intelligent gentleman.”
It is important to recognize that this ease is distinguishable from others in which we have found insufficient evidence of a disability; largely because Calef has presented evidence pertaining to all three of the factors we use to guide our analysis of whether a plaintiff is “substantially limited.” Cf. Carroll, 294 F.3d at 241 (no evidence that symptoms persisted); Whitney, 258 F.3d at 34 (impairment was mild, reversible and short lived); Santiago Clemente, 213 F.3d at 32 (impairment was temporary and no evidence of long-term impact); Bercovitch, 133 F.3d at 155-56 (no evidence of severity); Soileau, 105 F.3d at 15-16 (no evidence of severity or long-term impact). This is not to say that plaintiffs must present evidence pertaining to all three factors in order to survive summary judgment. See Navarro, 261 F.3d at 100 n. 6 (stating that the individualized nature of what constitutes a disability means “that the three listed factors can combine in a number of different ways, even to the exclusion of one or more of them”). Rather, it is merely a recognition that when plaintiffs present sufficient evidence as to all three factors the case is no longer “so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome.” FHS Props. Ltd. P’ship, 175 F.3d at 85.
TV. THE MAJORITY’S UNNECESSARY AND ERRONEOUS ANALYSIS OF “OTHERWISE QUALIFIED”
As I stated earlier, the majority’s conclusion that Calef is not disabled under the ADA means that further discussion of whether Calef is “otherwise qualified” is not required. As a general rule, I do not think that it is appropriate for an appellate court to make unnecessary pronouncements about the law. I can see no good reason for deviating from this general rule here, and therefore respectfully dissent from Part 11(B) of the majority’s opinion on that basis.
I also disagree with the substance of the majority’s analysis of whether Calef was “otherwise qualified” to perform the “essential functions” of his job, with or without a reasonable accommodation. First, the majority incorrectly defines “essential functions.” Without any citation, the majority states that it was an essential function of Calef s job to handle stressful situations “without making others in the workplace feel threatened for their safety.” I respectfully object to infusing the subjective fear of the nurses and Calefs supervisor into the “essential functions” analysis. Doing so opens the door for employers to fire disabled workers because other employees say they are afraid of their disabled colleagues.
There exists a separate and distinct analysis to deal with situations where a disabled person presents a “direct threat” to the safety of eoworkers. See 42 U.S.C. § 12113(b). The reason for using a separate analysis in such instances is to protect disabled people from “prejudice, stereotypes, or unfounded fear.” Sch. Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 287, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); see also EEOC v. Amego, 110 F.3d 135, 143 n. 5 (1st Cir.1997) (explaining that the legislative purpose of the “direct threat” analysis is to ensure that employment decisions are not based on “fears or stereotypes,” but rather objective evidence such as overt acts or threats of violence). This is not a direct threat case. There is no evidence that Calef was violent or threatened anyone with violence on December 6, 1996. Nor did Gillette raise the *96 “direct threat” argument on appeal.[16] See Beal Bank, SSB v. Pittorino, 177 F.3d 65, 68 (1st Cir.1999) (defenses not raised or undeveloped are waived). I also point out that the reason Gillette gave for firing Calef was that he refused to work overtime on Sunday and failed to cooperate with his supervisor, not that he threatened anyone with harm.
The majority suggests in a footnote that our holding in Amego stands for the proposition that the subjective fear of Calefs coworkers is relevant to this case. I do not read Amego as broadly as the majority. The holding in Amego was limited to situations where the “risk posed to others arises in the context of a core function of the job,” such as cases involving health care workers. 110 F.3d at 143-44. In those types of cases, examining the safety of others in conjunction with whether a person is “otherwise qualified” makes sense because the core job functions are intertwined with safety concerns. A mechanic’s core job functions are not intertwined with the safety of others in the same way as a health care worker. Therefore, the holding in Amego does not reach to this case.
The majority claims that its “otherwise qualified” analysis is “also the view of every circuit case which has addressed a similar situation under the ADA or the Rehabilitation Act.” The cases from other circuits upon which the majority relies do not address the same situation we face here. In all of those cases, the plaintiff was fired because he was violent or threatened violence. See Palmer v. Circuit Court, 117 F.3d 351 (7th Cir.1997) (plaintiff told coworker she would “kick her ass” and “throw her out of her window”); Johnson v. N.Y. Hosp., 96 F.3d 33, 34 (2d Cir.1996) (plaintiff had “violent scuffles with security guards”); Williams v. Widnall, 79 F.3d 1003, 1007 (10th Cir.1996) (plaintiff made threats against his supervisor and co-workers); Crawford v. Runyon, 79 F.3d 743, 744 (8th Cir.1996) (plaintiff made threats to hurt or kill his supervisor); Adams v. Alderson, 723 F.Supp. 1531, 1532 (D.D.C.1989) (plaintiff committed “a violent physical assault upon a female supervisor”). In sharp contrast, the parties all agree that Calef did not act violently or threaten anyone with violence on December 6, 1996. The parties also agree that Calef never had a violent incident at work after he began therapy and started taking medication.
The remaining two cases cited by the majority are from this circuit, and are also distinguishable. Reed v. LePage Bakeries, Inc., 244 F.3d 254 (1st Cir.2002), involved a plaintiff who, unlike Calef, failed to request a reasonable accommodation from his employer. This court called that failure “the fatal flaw in Reed’s case.” Id. at 260. Bercovitch involved a defendant that made numerous accommodations to the plaintiff, whereas here, Gillette refused outright Calefs requests for accommodation. 133 F.3d at 154. In addition, the plaintiff in Bercovitch was seeking a preliminary injunction and therefore had to prove a “probability of success” that he was otherwise qualified — which is a much higher burden than Calef faces on summary judgment. Id. at 151.
The majority’s discussion of whether Calef was “otherwise qualified” troubles me for another reason. The majority refers twice to the fact that “Calef never renewed his request to be moved to different machines.” The majority fails to un *97 derstand that an employer’s refusal to provide a requested reasonable accommodation is a violation of the ADA, see Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir.1999), regardless of how many times the employee asks. Here, Calef asked his boss for a reasonable accommodation and was “rejected out of hand.” Katz, 87 F.3d at 33. Calef then made the same request to his boss’s boss, and received the same treatment. My concern is that employers will now be discouraged from providing an accommodation upon an employee’s first request, or the second for that matter, in hopes that the employee will fail to “renew” the request. This behavior conflicts with the purpose of the ADA, which places emphasis “on encouraging the employer to engage in an interactive process with the individual to determine an effective reasonable accommodation.” Grenier, 70 F.3d at 677 (citation and quotation marks omitted) (emphasis added).
V. CONCLUSION
Calef has presented sufficient evidence from which a reasonable fact finder could, but need not, decide that he is disabled within the meaning of the ADA. This case should be remanded for further proceedings.

. A “major life activity" is an activity that is of central importance to most people's daily lives. Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). Calef contends that his ADHD affects the major life activities of learning and speaking, including communicating, thinking and concentrating. In the past, this court has treated communicating, thinking and concentrating as being subsumed by the broader activities of learning and speaking. See Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C., 258 F.3d 30, 33 n. 4 (1st Cir.2001). There is no question that learning and speaking are major life activities of central importance to most people's daily lives. See Whitney, 258 F.3d at 33 (learning); Santiago Clemente v. Executive Airlines, Inc., 213 F.3d 25, 30 (1st Cir.2000) (speaking); Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 155 (1st Cir.1998) (learning); 29 C.F.R. § 1630.2(i).

. The distinction between duration and long-term impact is that duration refers to the length of time an impairment persists, while long-term impact refers to the residual effects of an impairment. See Navarro v. Pfizer Corp., 261 F.3d 90, 98 (1st Cir.2001).

. In Toyota the Supreme Court questioned the persuasive authority of the EEOC regulations, but declined to decide the issue because, like the parties here, neither of the litigants contested the matter. Since Toyota, we have continued to use the EEOC regulations for guidance. See, e.g., Gonzalez, 304 F.3d at 73; Carroll, 294 F.3d at 239; Gillen, 283 F.3d at 21.

. For example, Calef scored "significantly below average” in a test designed to measure his resistance to distraction as tasks became increasingly more complex; he scored "significantly below the mean” on a test designed to measure his memory of complex visual organization and planning; he scored below the 25th percentile when asked to recall "a spatial task involving complex visual organization and planning”; he scored in the 16th percentile in "awareness of visual detail in the environment and visual sequencing ability”; he scored in the 2nd percentile "on a psychomotor task involving the rapid copying of figures associated with numbers”; and he scored in the 9th percentile "on a subtest requiring the solving of oral arithmetic problems.”

. Gillette concedes that the “direct threat” analysis is an affirmative defense that places the burden of proof on the defendant.