# United States Court of Appeals
## For the First Circuit

Nos. 01-1866
01-1903
01-2488

DAVID C. BISHOP,

Plaintiff-Appellee/Cross-Appellant,

v.

BELL ATLANTIC CORPORATION,

Defendant-Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lynch, Circuit Judge.

Martha S. Temple, with whom Foote & Temple was on brief, for
David C. Bishop.

Barry A. Guryan, with whom Jeffrey M. Rosin and Epstein Becker
& Green, P.C., were on brief, for Bell Atlantic Corporation and Lon
Bannett for Verizon Corporation.

August 9, 2002

**BOWNES, <u>Senior Circuit Judge</u>**.  Plaintiff-appellee/cross-appellant David C. Bishop brought numerous claims of unlawful retaliation against his employer, defendant-appellant/cross-appellee Bell Atlantic Corporation, under the Maine Whistleblower's Protection Act, 26 M.R.S.A. § 831 <u>et</u> <u>seq.</u> (MWPA), and the Maine Human Rights Act, 5 M.R.S.A. § 4572 (MHRA).  A jury found in Bishop's favor on three of the six claims of retaliation that went to trial.  Bell Atlantic contends that Bishop neither exhausted his administrative remedies nor established a prima facie case of retaliation as to any of the three claims.  We hold that Bishop's claims fail on the merits; accordingly, we reverse and direct entry of judgment for Bell Atlantic.

## I.  BACKGROUND

Since 1988, Bishop has been employed by Bell Atlantic as a Splice Service Technician (SST), installing and repairing telephone line service.  On August 26, 1997, Bishop filed his first charge with the Maine Human Rights Commission (MHRC), alleging that Bell Atlantic retaliated against him in violation of the MWPA after he reported an assault by his supervisor, Frank Szylvian, on or about May 7, 1997.  He contended that the retaliation took the form of Szylvian (1) interfering with his overtime opportunities; and (2) following him around and taking notes on his work.[1]

---

[1]We set forth the individual claims of retaliation sequentially as they appear in Bishop's filings.

-2-

Several months later, Bishop filed a second charge, in which he alleged that Bell Atlantic retaliated against him in violation of the MHRA by (3) refusing to provide him with a hard hat liner for warmth; (4) refusing to pair him up with another employee during an ice storm in 1998; and (5) not paying him for overtime in January, 1998. The MHRC dismissed both of these charges on April 28, 1999.

On February 3, 1999, Bishop filed his third MHRC charge, in which he alleged that Bell Atlantic retaliated against him by (6) forcing him to work with an injured elbow. The MHRC dismissed this charge on October 6, 1999. It appears that at least some of the retaliation complaints were investigated by the MHRC.

On May 3, 1999, Bishop filed suit in the Maine Superior Court against Bell Atlantic, asserting the same factual claims as in his three MHRC charges. He did not assert either a continuing violation or a general harassment theory in his lawsuit. Bishop's case was removed to the United States District Court for the District of Maine.

On July 23, 1999, Bell Atlantic moved to dismiss Bishop's claims. It argued that the claims required interpretation of the terms of the collective bargaining agreement governing his employment and thus were preempted by section 301(a) of the Labor-Management Relations Act. On November 19, 1999, the district court

-3-

allowed Bell Atlantic's motion as to Bishop's MWPA count.[2]  It denied the motion as to claims (3), (4), (5) and (6).

After the close of discovery on April 13, 2000, Bishop alleged two additional incidents of retaliation:  (7) that he was wrongfully suspended for three days on February 28, 2000; and (8) that his temporary transfer to the Bar Harbor, Maine, reporting area was canceled.  Bishop did not file any new MHRC charges relative to these allegations.

On July 17, 2000, Bell Atlantic moved for summary judgment.  In his opposition brief, Bishop alleged ten new incidents of retaliation:

(9)        Bell Atlantic sent him for retraining on October 6, 1997;

(10)       Bell Atlantic placed new negative documents in his personnel file between the time he saw his file on September 23, 1997, and the time he saw it in December 1997;

(11)       he did not receive rain gear between February and May 1999;

(12)       he was not reimbursed for traveling to Portland, Maine, on August 23, 1998;

(13)       he did not receive credit for the third of three jobs he performed on October 18, 1998;

(14)       he was recalled from two job sites on November 19, 1999, and did not receive credit for the jobs;

(15)       he was placed on an "action plan" on November 16, 1999;

---

[2]The court treated Bell Atlantic's motion as one for summary judgment.

-4-

(16)     Bell Atlantic hid documents related to this lawsuit from him in the summer of 2000;

(17)     he was missing pay for overtime from August 1997 through March 1998; and

(18)     he was denied overtime opportunities.

Again, Bishop did not file any new MHRC charges relative to these allegations. In ruling on Bell Atlantic's summary judgment motion, the district court found no genuine dispute of fact as to claims (3), (4), (5), (6), (8), (10), (12), (14) and (16) above.

On February 5, 2001, Bishop stated in his trial brief that he intended to introduce at trial additional retaliation claims based on a one-day suspension for his conduct on September 16, 2000, and a two-week delay in his receipt of retroactive wages on November 2, 2000. Bell Atlantic moved in limine to prevent Bishop from doing so, pointing out that Bishop had known about these incidents months earlier. On February 6, 2001, the district court allowed Bell Atlantic's motion.

The trial began on February 12, 2001, based upon the remaining claims of retaliation:

(1)     on February 28, 2000, Bell Atlantic suspended Bishop for three days;

(2)     on October 6, 1997, Bishop was sent for retraining;

(3)     between February and May, 1999, Bishop was not given rain gear;

(4)     on October 18, 1998, Bishop was not given credit for the third of three jobs he performed;

-5-

(5)     on November 16, 1999, Bishop was placed on an "action plan";

(6)     from August 1997 through March 1998, Bishop was missing pay for overtime; and

(7)     Bishop was denied overtime opportunities.

On February 16, 2001, at the close of Bishop's case, Bell Atlantic moved for judgment as a matter of law. It challenged the merits of Bishop's retaliation claims, but did not argue that Bishop failed to exhaust his administrative remedies. The district court allowed the motion only as to trial issue (2), on the ground that events giving rise to this claim occurred before Bishop's first MHRC charge.

Bell Atlantic renewed its motion for judgment as a matter of law at the close of its own case. The district court reserved decision and submitted the case on special interrogatories to the jury. The court asked whether each of the six remaining incidents was individually an act of retaliation against Bishop "because" he filed charges with the MHRC.

The jury found in favor of Bishop on the first, fourth and fifth of the seven claims set forth above. It awarded him $250,000 in compensatory damages flowing from his emotional distress. The jury also awarded $50,000 in punitive damages. The court denied Bell Atlantic's motion for judgment as a matter of law.

After the trial, Bishop requested specific injunctive relief. He asked the district court for an award of prejudgment interest on the verdict and for a cease and desist order. On February 27, 2001, the court entered a cease and desist order, but declined to award prejudgment interest. Bell Atlantic's appeals and Bishop's cross-appeal followed.

## II. DISCUSSION

We review de novo the denial of a motion for judgment as a matter of law. Andrade v. Jamestown Hous. Auth., 82 F.3d 1179, 1186 (1st Cir. 1996). We apply the same standard as the trial court, which allows the motion only if "the evidence, viewed from the perspective most favorable to the non-movant, is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." FHS Props. Ltd. P'Ship v. BC Assocs., 175 F.3d 81, 85 (1st Cir. 1999) (quoting Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994)).

Bell Atlantic first argues that Bishop failed to exhaust his administrative remedies as to his successful retaliation claims. Like Title VII, the MHRA requires that a plaintiff file a discrimination claim at the agency level before proceeding to court. Walton v. Nalco Chemical Co., 272 F.3d 13, 20-21 (1st Cir. 2001); Gordan v. Cummings, 756 A.2d 942, 944-45 (Me. 2000); see also Clockedile v. N.H. Dep't of Corrections, 245 F.3d 1, 3 (1st

-7-

Cir. 2001) (Title VII requires administrative charge as predicate to civil action).

Bell Atlantic failed to preserve its exhaustion argument for our usual review on appeal. Although it presented this argument at summary judgment, it did not do so in either of its motions for judgment as a matter of law. See Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 951 (1st Cir. 1995); Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1250-51 (10th Cir. 1992), and cases cited. Accordingly, we "review only for plain error resulting in a manifest miscarriage of justice." Hammond v. T.J. Litle & Co., Inc., 82 F.3d 1166, 1172 (1st Cir. 1996); Scarfo, 54 F.3d at 951.

Although we decline to hold that a miscarriage of justice occurred here, we conclude that reversal is appropriate in any event. As set forth below, Bishop failed to adduce sufficient evidence to support his claims on their merits.

Where, as here, there is no direct evidence of retaliation, "the McDonnell Douglas burden-shifting framework is used to allocate and order the burdens of producing evidence."[3] Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). To establish a prima facie case of retaliation under the

---

[3]The Supreme Court of Maine explicitly adopted the McDonnell Douglas framework as applied to employment discrimination claims brought under the MHRA. Me. Human Rights Comm'n v. Auburn, 408 A.2d 1253, 1261-63 (Me. 1979).

-8-

MHRA, Bishop must show that: (1) he engaged in protected conduct under the statute; (2) he suffered an adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action. See id.; Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 262 (1st Cir. 1999). Once he makes his prima facie showing, the burden shifts to Bell Atlantic to articulate legitimate, non-retaliatory reasons for its employment decisions. See Fennell, 83 F.3d at 535; see also Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If the defendant does so, the ultimate burden falls on the plaintiff to show that the proffered legitimate reason is pretextual and that the adverse employment action resulted from the defendant's retaliatory animus. Fennell, 83 F.3d at 535 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993)).

### A.    The October 18, 1998 Lack Of Credit

Bishop alleged that he did not receive credit for one of three jobs he performed on October 18, 1998. To receive credit, a SST must "close out" each job on an automated computer system. Bell Atlantic's trial evidence showed that the system shuts down in the evening to back up and compile the data, and that thereafter, SSTs cannot enter additional jobs. Bishop and another SST testified that in the past, they had received credit for work performed after 7:00 p.m.

-9-

The lack of credit for this job had only a de minimis impact on Bishop's overall work performance numbers, and no effect on his pay. Records for January through November, 1998, showed that Bishop completed 503 out of 571 combined assignments during the first eleven months of 1998, or 88.1% of his assigned jobs. Had he received credit for his third job on October 18, 1998, he would have had credit for 504 jobs, or 88.2%.

Given the absence of evidence of meaningful consequence to Bishop, we cannot conclude that he satisfied his prima facie burden to show that he experienced an adverse employment action. See Connell v. Bank of Boston, 924 F.2d 1169, 1179 (1st Cir. 1991). The denial of credit simply did not alter a term or condition of employment. See Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997) (discussing which of employer's actions can give rise to adverse impact on employee with respect to "compensation, terms, conditions, or privileges of employment."). "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996). To allow this claim to go to the jury was error.

### B.  The November 16, 1999 Action Plan

The record indicates that on November 16, 1999, Bishop was placed on an "action plan" after repeated problems with low

-10-

productivity and warnings from his supervisors. According to Bell Atlantic, the action plan was intended to address Bishop's low productivity and his failure to adequately communicate with his supervisor about completing jobs. The plan required Bishop, if he was unable to complete a job by the end of a day, to inform one of his supervisors by telephone. He was provided a list of several supervisors and their telephone numbers; if he could not reach the first supervisor on his list, then he was required to call another.

Bishop contends that the action plan was so onerous that it reduced his productivity and his overtime opportunities. It is undisputed, however, that Bishop's productivity <u>increased</u> for a period of time shortly after he was placed on the action plan.

Nor is there sufficient evidence suggesting that Bishop was somehow singled out for this treatment. It is uncontested that company policy (predating Bishop's MHRA charges) required all SSTs to call a supervisor if they had difficulty completing a job. Moreover, other employees were identified as substandard performers and placed on action plans until their work improved. This apparently routine application of pre-existing company policy to Bishop cannot be construed as adverse employment action as required under the MHRA. <u>See</u> <u>Connell</u>, 924 F.2d at 1179. Hence, we conclude that no reasonable jury could find in Bishop's favor on this claim.

## C. The February 28, 2000 Three-Day Suspension

On February 28, 2000, Bishop was suspended for three days. Bell Atlantic imposed this discipline after Bishop sliced partway through the fibers in a telephone wire, rendering them useless, and then left for the day without telling anyone that future work needed to be done. Bishop contended at trial that the wire was defective; he stated that he had "trimmed out" such defective wire in the past without punishment, but had never before "clipped" a wire. Bell Atlantic contended that Bishop's actions were professionally unprecedented and inappropriate, and that he had violated company policy by failing to report that the wire needed to be replaced.

Bishop's suspension was imposed after an investigation by his supervisors and by Bell Atlantic's corporate security department.[4] This investigation included a referral of the matter to corporate security, a view of the scene both the day after the incident and immediately before Bishop's suspension, and interviews of Bishop. The suspension was imposed following Bishop's admission that he made the cut and that he did so to ensure that the wire could not be reused and would have to be replaced.

---

[4]Bishop committed this act on November 16, 1999, the same day that he was informed about his action plan. Bishop's supervisor, James Jordan, testified that he perceived the act to be a "willful destruction of telephone company property."

As Bell Atlantic conceded below, the suspension undoubtedly constituted an adverse action against Bishop. We think that Bishop failed to adduce sufficient evidence of another element of his retaliation case, however: the required nexus between the protected conduct (in this case, filing his MHRC charges) and the suspension. See Higgins, 194 F.3d at 262. In light of Bell Atlantic's evidence concerning the nature of Bishop's conduct and the resulting investigation, Bishop simply did not provide sufficient basis for the jury to conclude that the suspension was imposed because of his agency filings. We note that Bishop's suspension did not follow closely on the heels of his MHRC charges: it was imposed thirty months after the first charge, twenty-four months after the second, and twelve months after the third. In the absence of other evidence of retaliatory animus, this substantial amount of time between the administrative filings and the alleged retaliation does not support the required nexus. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272-74 (2001) (if temporal proximity is the only evidence of causality establishing prima facie retaliation, proximity must be "very close"; twenty months is insufficient); see also Oliver v. Digital Equip. Corp., 846 F.2d 103, 110-11 (1st Cir. 1988). In sum, we think the district court erred in allowing the jury to consider this claim.

Because we reverse the judgment below, we need not address Bell Atlantic's other appeal (concerning attorneys' fees) or Bishop's cross-appeal (concerning prejudgment interest).

The judgment of the district court is **<u>REVERSED</u>**. Costs on appeal are awarded to defendant-appellant.