Althea **BOOKER**

v.

**MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH (The Lemuel Shattuck Hospital), The Executive Office of Health and Human Services, Paul Romary, Edward Nicosia, Jennifer Foley, and Shawn McMullen.**

**Civil Action No. 05–12103–RGS.**

United States District Court,
D. Massachusetts.

Dec. 21, 2007.

Irene H. Bagdoian, Matthew Q. Berge, Jean M. Kelley, Office of the Attorney General, Bryan G. Killian, Massachusetts Attorney General's Office, Boston, MA, for Defendants.

Mark Booker, Law Offices of Mark Booker, Matthew J. Tuttle, Burns & Levinson LLP, Boston, MA, for Plaintiff.

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

On October 20, 2005, Althea Booker filed this race-based employment discrimination lawsuit against the Lemuel Shattuck Hospital (Hospital) and its umbrella agency, the Executive Office of Health and Human Services (EOHHS). She also named as defendants four of her Hospital supervisors.[1] Booker claims that she was denied earned compensation because of her race, and unfairly disciplined after complaining about pervasive instances of discriminatory workplace conduct. The Complaint is in nine counts, alleging various violations of state and federal law, as well as related

---

1. The individual defendants are Paul Romary, the Chief Executive Officer of the Hospital; Edward Nicosia, the acting Director of the Hospital's Facilities Management Department; Jennifer Foley, the Hospital's Director of Labor Relations; and Shawn McMullen, the Chief of the Hospital's Campus Police Department. Each is named in a personal as opposed to an official capacity.

claims of retaliation.[2] Each defendant has filed a separate motion for summary judgment. A hearing on the multiple motions was held on November 20, 2007.[3]

## BACKGROUND

The facts in the light most flattering to Booker as the nonmoving party are as follows. Booker, an African–American woman, began her employment at the Hospital in 1987, when she was hired as a Telephone Operator I. In September of 2001, Booker was promoted to Communication Dispatcher · II. In that position, Chief McMullen became her direct supervisor. Booker claims that defendants: (1)

**2.** Specifically, Booker alleges violations of Title VII of the federal Civil Rights Act of 1964 and of Mass. Gen. Laws c. 151B, § 4 (Counts I and II, respectively, both asserted against the Hospital and EOHHS); retaliation in violation of Title VII (Count III, asserted against the Hospital and EOHHS); retaliation in violation of state law (Count IV, asserted against all defendants); interfering with Booker's right to be free of discrimination in violation of Mass. Gen. Laws, c. 151B, § 4 (Count V, against all defendants); aiding, abetting, inciting or compelling discrimination in violation of Mass. Gen. Laws, c. 151B, § 4 (Count VI, asserted against the individual defendants only); libel (Count VII, against the individual defendants); tortious interference with contractual relations (Count VIII, against the individual defendants); and intentional infliction of emotional distress (Count IX, against Nicosia and McMullen only). At the hearing, Booker voluntarily dismissed Counts VII and IX (libel and intentional infliction of emotional distress at to all defendants). Additionally, she dismissed Count VIII (tortious interference), as to all defendants except Nicosia.

**3.** In her original Complaint, Booker set forth allegations of instances of discrimination and retaliation spanning the period September 9, 2003, through June 21, 2005. On October 24, 2006, Booker filed an assented-to motion seeking leave to file a supplemental pleading to add new claims of discrimination and retaliation that arose after the filing of the Complaint. On October 26, 2006, the court allowed the motion, noting that the "PLEADING MUST BE SUBMITTED IN THE FORM

refused to pay her the supplemental compensation that she was owed under the terms of a collective bargaining agreement (CBA); (2) failed to respond promptly and satisfactorily to several "Incident Reports" that she filed; and (3) relegated her to undesirable and unwanted job assignments. Booker alleges that defendants acted out of racial animus and/or a retaliatory motive.

### 1. Call–Back Pay

From September 24, 2001, through September 9, 2003, Booker received work-related calls from her staff while at home on an almost daily basis. She inquired of

OF AN AMENDED COMPLAINT." (Emphasis in the original). Booker did not then file an Amended Complaint. On August 27, 2007, and September 7, 2007, defendants filed their motions for summary judgment. On October 30, 2007, Booker undertook to file an Amended Complaint. A year is not a reasonable time in which to comply with a court order, particularly one that plaintiff herself sought. This is especially so where delay might reasonably prejudice defendants, as is usually the case when a motion to amend is filed after the issue of summary judgment has been joined. *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir.1994). "As a case progresses, and the issues are joined, the burden on a plaintiff seeking to amend a complaint becomes more exacting.... [A]fter the opposing party has timely moved for summary judgment, a plaintiff is required to show 'substantial and convincing evidence' to justify a belated attempt to amend a complaint." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir.2004), citing *Gold*, 30 F.3d at 253. Booker has offered no substantial justification for the delay. She merely states that the court did not specify the date by which she was to file the Amended Complaint. This argument, such as it is, supposes an unreasonable degree of micromanagement by the court. Counsel are expected to respond to a court order with reasonable diligence and without prompting by the court. The Amended Complaint will be stricken.

McMullen whether she was entitled to be compensated for taking calls on her private time. Although McMullen assured Booker that he would look into the matter, he never got back to her. In September of 2003, Booker remembered that at least one of her white predecessors had been compensated for taking calls at home. At a September 9, 2003 meeting with Nicosia and McMullen, Booker demanded that she be paid as well. Nicosia told Booker that she would be compensated for taking future calls as the CBA provided for a minimum of two hours of "call back pay" at one hundred and fifty percent of an employee's hourly wage.

Within hours of the meeting, Nicosia and McMullen co-authored and circulated a memorandum to employees of the Communication Department, which stated in pertinent part:

Communication Department staff are reminded that Communication Department issues should be reported to the Department supervisor during normal business hours (7:00 AM—3:00 PM) .... The Communication Department Supervisor shall not be called at home to discuss unscheduled shift vacancies unless it is the Department Supervisor's turn for overtime shift coverage. Employees are discouraged from calling the Communication Department Supervisors at home with work related issues unless the situation is of an emergency nature and the available 'on-duty' staff and the 'Administrator on Call' are unable to address the issues/concerns.

Approximately two months later, on December 8, 2003, Renee Bennett, one of Booker's then-subordinates, telephoned

McMullen at home to obtain permission to take a vacation day. In addition, on December 14, 2003, McMullen received a telephone call from Debra Santos, another of Booker's then-subordinates, who reported that she was having difficulty getting to work that night because of a snowstorm. When Booker learned of the calls placed to McMullen, she became concerned that McMullen was trying to divert income that was rightfully hers.[4]

On December 15, 2003, Booker delivered a letter to Nicosia claiming that the Hospital owed her two years of accrued call-back pay.[5] Booker blamed the non-payment on racial discrimination. She also complained that McMullen (who is white) had appropriated her opportunity to earn call-back pay and had undermined her supervisory authority. Booker wrote,

[y]ou and Shawn McMullen acted with dispatch to ensure my non-compensation for call-back pay. Neither of you did anything to alleviate the problems that I identified. Since then, the historical record has brought to light your hypocrisy and Mr. McMullen's unabashed avarice. Let's see whether this expose will prompt you to remedy the unfairness as quickly as you designed it. Regardless, be assured that I shall not grant any quarter to your scandalous behavior. This letter represents a relatively whispering salvo in what could become a vigorous public challenge of rampant institutional racism at the Hospital.

On January 22, 2004, Nicosia sent Foley an email in which he stated "Althea is requesting a meeting with me to review two year's worth of call-back pay. She

---

4. Booker knew that several African–African campus police officers (CPOs) had previously complained that McMullen had diverted overtime opportunities belonging to them. She was also aware that Hospital employees had

accused McMullen of "double dipping" (being paid for working two shifts simultaneously).

5. Booker delivered copies of the letter to Romary and Foley.

claims to have received phone calls at home for the last two years without compensation. I'm not sure whether I can validate the calls, unless they are in the communications log book. Even so, waiting two years and then asking for the money seems like a little bit of a stretch. I do not support paying her for these calls." Foley then replied to Nicosia via email, stating that "[Althea] is responsible for proving when these calls came to her and for what reasons in writing. She should have also filed a grievance if she felt she was entitled to this money." Within two hours, Nicosia instructed McMullen to remove the log book—which documented at least thirty-five of the calls that Booker had received between September of 2001 and September of 2003—from departmental headquarters.

### 2. Incident Reports

Booker additionally complains that racial bias caused defendants to respond halfheartedly (or not at all) to Incident Reports that she filed. She contends that defendants responded with far greater zeal to Incident Reports filed by white officers. Specifically, Booker takes issue with the response to an Incident Report filed by McMullen about an exchange that he claimed to have had with Booker on December 15, 2003.[6] On January 5, 2004, Nicosia met with Booker and McMullen regarding McMullen's complaint. Booker apologized to McMullen for failing to make her remarks in a more private setting. She refused, however, to retract the substance of her accusations. On January 26, 2004, Booker received a written warning that tracked verbatim the charges contained in McMullen's Incident Report. On January 29, 2004, Booker filed a grievance challenging the warning. On January 30, 2004, Booker sent an email to Nicosia (with copies to Foley and McMullen) demanding to know the whereabouts of the log and insisting on its return.

Booker contrasts the alacrity with which Nicosia responded to McMullen's Incident Report to his handling of Reports that she filed. On October 2, 2003, Booker filed an Incident Report about an interaction that she had had with two CPOs.[7] By the time Booker met with Nicosia on January 5, 2004, she had yet to receive a formal response to the Report. Nicosia told Booker that he had never seen it. On January 8, 2004, Booker delivered a copy of the Report to Nicosia, who directed McMullen to

---

**6.** McMullen claimed that on the morning following his receipt of Santos' telephone call, Booker confronted him and asked why the call was not redirected to her. McMullen told Booker that she had requested that she be called at home only in an emergency, and that Santos' request did not in his mind rise to the level of an emergency. Booker then allegedly accused McMullen of being a "white racist who steals from the Negroes." McMullen asked, "Are you saying I'm a racist?" Booker (according to McMullen) replied, "Yes. You, Nicosia, and all the other white supervisors in this place." She then advised McMullen that she had retained an attorney, and that she intended to sue "all of them." McMullen filled out an Incident Report and handed it directly to Nicosia, rather than sending it to Risk Management. Booker was never interviewed about McMullen's version of the incident.

**7.** The Incident Report stated, "This morning when I arrived Gerald Robinson was folding a newspaper (Herald). I asked him if the paper was the complimentary copy usually left at [the switchboard]. Mr. Robinson and Mr. Todd began to answer me, in unison, that the paper was intended for Kevin, not for operators, except for operators to pass on to him. Mr. Robinson became extremely irate and stated, 'Althea, you better watch what you say to me. I have two people in this dept. who have told me you said I am prejudiced and a racist. Louis is one of them. You better watch what you say about me.' His manner was threatening."

investigate.[8] Nicosia and Foley ultimately reviewed statements given by the officers involved and concluded that the no disciplinary action was warranted. Booker was never advised of the decision.[9]

On February 6, 2004, Booker filed a charge with the Massachusetts Commission Against Discrimination (MCAD), naming the Department of Public Health, Romary, Nicosia, and McMullen as respondents. Booker claimed that defendants had discriminated against her with respect to call-back pay, and that when she complained, retaliated against her by issuing the written warning on January 26, 2004, by failing to investigate her October 2, 2003 Incident Report, and by refusing to return the log book.

### 3. New Job Duties

Booker alleges that defendants further discriminated against her by modifying the terms and conditions of her employment. One of Booker's preferred duties was acting as a police dispatcher. After she filed her first MCAD complaint, her dispatching duties were reassigned to the CPOs. In December of 2004, Richard Wong, the Hospital's Director of Safety, told Booker that she should not serve as a dispatcher whenever five or more CPOs were on duty. Wong then announced a permanent duty roster, which called for at least five CPOs to be on duty at all times. Booker claims that Wong assigned a white woman to work as a dispatcher on the shift following hers without regard to the level of CPO staffing. On March 15, 2005, Wong advised Booker that she would be trained to do mail room duty, as she would hence-

forth be required from time to time to cover the mail room.

### 4. Retaliation

Booker claims that she suffered various retaliatory acts in the wake of her first MCAD charge. She claims that after the filing, McMullen asked one of her subordinates to provide a written statement about "something" that she had done.[10] He allegedly told the employee that because Booker had complained about him, he intended to "get something on her, too." McMullen then issued Booker a ticket for a parking violation that other employees committed with impunity. On March 4, 2004, Nicosia charged absences against Booker's personal time that should have been charged as sick time. He additionally accused Booker of making fraudulent use of sick leave. When Booker confronted Nicosia about the accusation, he challenged her to spell "languishing filibuster," an ornate phrase that she had incorporated into her MCAD charge. Booker complained about Nicosia's demeaning comment to Romary, and filed another Incident Report. Booker was never informed of any investigation of her complaint.

On March 5, 2004, Nicosia allegedly told Foley that he "still intend[ed] to continue documenting all occurrences with [Booker], for use in a progressive discipline case." On one occasion, Nicosia contested the legitimacy of Booker's illness-related absence from work. When Wong told Nicosia that Booker appeared to be genuinely ill, Nicosia wrote to him, "Forget about

---

**8.** Booker claims that McMullen was an inappropriate choice as an investigator because of the conflict of interest created by their then pending cross-allegations.

**9.** Booker also complains that on September 13, 2004, a white male Hospital employee

"confronted" her with a dead rat attached to a glue board. Booker complained to Romary, and later filed another Incident Report detailing the incident.

**10.** The record does not indicate what that "something" was.

this one. I am being discouraged from pursuing this for a fear of appearing to be singling her out. Drop the conversation with her as soon as possible and avoid discussing it any further."

On May 11, 2005, Booker filed a second MCAD charge, which she claims initiated a second round of retaliation. Specifically, on May 12, 2005, defendants began an investigation of two Incident Reports filed by CPO Mark Smith describing a confrontation with Booker.[11] On May 20, 2005, Foley asked Nicosia and Wong to make witnesses to the confrontation available for interviews. Wong replied in an email, "FULL COOPERATION. Like to see the fat lady get a taste of her own medicine." On June 20, 2005, Booker was informed by letter that she was being given a one-day suspension without pay as a result of the Smith allegations.

### APPLICABLE LAW

■ Summary judgment will be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphases in original). "Neither conclusory allegations nor improbable inferences are sufficient to defeat summary judgment. Rather, to withstand a properly supported motion for summary judgment, the opposing party must present enough competent evidence to enable a factfinder to decide in its favor on the disputed claim." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236–237 (1st Cir.2002) (internal punctuation and citations omitted).

### 1. *Discrimination Claims*

■ As Booker does not offer direct evidence of racial discrimination, the court will apply the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, Booker must first establish a prima facie case of discrimination. The burden of making a prima facie case is "not onerous." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under both state and federal law, Booker must show that (1) she is a member of a protected class; (2) she was performing her job in an acceptable manner; and (3) her employer took an "adverse" employment action against her. *See Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir.2001). A successful prima facie showing gives rise to an inference that defendants discriminated against Booker because of her race. The burden then shifts to defendants to articulate a legitimate, non-discriminatory reason for refusing to compensate Booker for accrued call-back pay and for failing to investigate her complaints about McMullen and other Hospital

---

11. Smith's Reports detailed two separate confrontations that he had with Booker in April of 2005. According to Smith, he and Booker had an argument because he wanted to swap his hand-held communications radio for a radio with a belt clip that he saw on Booker's desk. Booker refused to give him the radio, and told him "I don't know who the hell you are, but you're not a man .... You're just a door mat." During the second tête-à-tête, when Smith mentioned the need for an escort for an intoxicated Hospital visitor, Booker purportedly remarked that it was he who needed to be escorted.

employees. "This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times." *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 823 (1st Cir.1991). If defendants offer a non-discriminatory reason or reasons, the presumption of discrimination vanishes, and Booker is required to show that defendants' proffered justification is merely a pretext for racial discrimination. *Id.* at 824. "It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [s]he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real [and discriminatory] motive." *Id.* (internal citation and quotation marks omitted).

 With this framework in mind, the court will turn to Booker's claims. Although defendants maintain that Booker has filed to satisfy the second and third prongs of the prima facie test, the court disagrees. Defendants' evidence is not that Booker was performing her job at an unacceptable level—by all appearances she was a competent employee—but that her supervisors disliked her because they thought her *obnoxious* and *overbearing.* Similarly, a denial of compensation, a suspension without pay, and a diminution of job responsibilities, if not severe examples of adverse employment actions, sufficiently satisfy the test. *See Blackie v. State of Maine,* 75 F.3d 716, 725 (1st Cir.1996). Defendants alternatively offer three racially-neutral reasons for refusing Booker's claim for retroactive call-back pay. First, they maintain that Booker was entitled to call-back pay only under the CBA that took effect on July 1, 2003, while Booker's demand was for two years of pay retroactive to September of 2001.[12] Second, the CBA required an employee to grieve any violation of its terms within twenty-one days of its occurrence. Booker never filed a grievance.[13] Finally, defendants contest Booker's description of Nicosia's and McMullen's memorandum discouraging employees from calling supervisors at home as intended to undermine her opportunities to earn call-back pay. According to defendants, the memorandum was motivated solely by the desire to contain costs under the new CBA.[14]

Defendants further proffer that their responses to the various Incident Reports filed by Booker and others were appropriate. They maintain that they were justified in issuing a written warning for insubordination following Booker's confrontation with McMullen on December 15, 2003. Booker refused to submit her version of events in writing, and she admitted that the manner and context in which she spoke to McMullen was inappropriate. Moreover, they argue that there was no need to respond to Booker's Incident Report of October 3, 2003, because the investigation

12. Defendants state that Booker has received call-back pay for at-home calls fielded since September of 2003. This point, however, would sum more relevant to damages, which are admittedly meager.

13. Booker offers no facts disputing defendants' contention that she has been compensated for at-home calls she has taken since September of 2003. Nor has she offered any facts disputing defendants' assertion that she had no entitlement to call-back pay prior to the effective date of the amendment to the 2003 CBA.

14. Defendants state that contrary to Booker's assumption, McMullen did not seek or receive compensation for taking the telephone calls from Bennett on December 8, 2003, or from Santos on December 14, 2003. The court also notes that there is no evidence to suggest that the memorandum did not have the equivalent impact on McMullen's earning potential as it did on Booker's.

concluded that the Report involved no more than a trivial tiff over a newspaper. With regard to the one-day suspension imposed after the investigation of Smith's Incident Reports, defendants argue that Booker was properly disciplined for inappropriate and unprofessional behavior: Booker had shouted at Smith, and had called him derogatory names in public. The explanations with respect to both the call-back pay and the Incident Reports, in the court's judgment, easily satisfy defendants' burden of coming forward with non-discriminatory reasons for their actions. *See Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.2003).

■ Accordingly, under *McDonnell Douglas*, the burden shifts to Booker to show that defendants' proffered reasons are merely pretexts intended to camouflage a discriminatory animus. In evaluating Booker's claims, "the full panoply of circumstantial evidence is available, including but not limited to statistical evidence showing disparate treatment by the employer of members of the protected class, comments by decision makers which denigrate [persons in the protected group], the incidence of differential treatment in the workplace, and the deployment of . . . replacements." *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 581 (1st Cir. 1999) (citation and quotation marks omitted). A persuasive means of establishing pretext is to show that similarly-situated employees belonging to a different racial group were given preferential treatment. *See, e.g., Matthews v. Ocean Spray Cranberries*, 426 Mass. 122, 129, 686 N.E.2d 1303 (1997). To make such a showing under both Title VII and G.L. c. 151B, a plaintiff must "identify and relate specific

instances where persons similarly situated in 'all relevant aspects' were treated differently. The plaintiff must identify other employees to whom [s]he is similarly situated in terms of performance, qualifications, and conduct, without such differentiating or mitigating circumstances that would distinguish their situations." *Id.* (citations omitted).

Booker's evidence that she was refused retroactive call-back pay because she is African–American is, to say the least, thin. Booker offers a "recollection" that a white employee had at some time in the past received call-back pay. However, she does not identify when or under what circumstances the employee was paid. Booker attempts to portray McMullen as a racist by reciting a remark he made about an African–American woman who had been attacked by an escaped gorilla. McMullen joked that the gorilla was simply attempting to mate with the woman.[15] While McMullen's alleged joke (if made) was grossly offensive, McMullen was not involved in the decision to deny Booker call-back pay, nor was he responsible for acting on her Incident Reports.

In addition to McMullen's insensitive comment, Booker offers other instances of racially offensive behavior by Hospital employees in support of her claim of discriminatory animus. In March of 2004, an African–American employee reported that a white co-worker had thrown water on him and called him "nigger." Booker claims that the co-worker was never disciplined. In addition, Booker relates an incident in which a white CPO commented that a black employee should be tied to a tree with a sign around his neck reading "niggers suck." Finally, in May of 2005, Santos

15. Booker also claims that McMullen and another CPO used a Hospital vehicle to transport an African–American visitor to the Hospital who had been arrested by McMullen to his home, where they conducted an unlawful search for drugs. The import of this incident is unclear. Booker makes no claim that the arrest itself was improper.

(who is African–American), claimed that a white co-worker had followed her in the parking lot shouting obscenities.[16] None of the instances cited by Booker involving offensive remarks were directed at her, nor did they involve any of the decision makers about whom she complains.

 " [S]tray remarks in the workplace . . ., statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself normally are insufficient to prove [an] employer's discriminatory animus." *Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 13 (1st Cir.1998); *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 56 n. 5 (1st Cir.2000) (same). *See also Velazquez–Fernandez v. NCE Foods, Inc.*, 476 F.3d 6, 11–12 (1st Cir.2007) (a sole remark by a nondecisionmaker could not support an inference of pretext); *Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69 (1st Cir.2002) (" [S]tray workplace remarks', as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus.").[17]

Finally, Booker claims that statistical disparities between the number of black and the number of white Hospital employees who are disciplined provides evidence of institutional racial bias. According to Booker, from January of 2000 through July of 2007, white employees made up 48.7 percent of the Hospital's employee population, while black employees comprised 40.78 percent. During this same time period, 59.7 percent of the disciplinary matters at the Hospital involved black employees, while only 31.5 percent involved white employees.

 Statistical evidence is of marginal assistance in a disparate treatment case because unless very powerful, it reveals little of an individual plaintiff's circumstances, particularly with respect to co-workers with whom she seeks to compare herself. *See Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 32 (1st Cir.2003); *McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 303 (1st Cir.1998). Booker's raw statistical compilation, assuming its accuracy, does not disclose the number of disciplinary actions undertaken by the defendants about whom she complains or their racial breakdown. Nor do the gross statistics reveal the severity of the discipline imposed on white versus black employees, and/or the number of disciplinary actions imposed by black supervisors on black employees versus those imposed by or on whites. *See LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir.1993) ("statistics alone" are unlikely to ever be probative of a discriminatory animus in a disparate treatment case).

 A plaintiff does not carry her burden of demonstrating pretext on a motion for summary judgment where she provides merely "sketchy evidence lacking a sufficient foundation for a legally relevant comparison" of allegedly similarly situated employees. *Matthews*, 426 Mass. at 131, n. 5, 686 N.E.2d 1303, citing *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994). Simply put, Booker has not "provided sufficient evidence for a jury to disbelieve [defendants'] stated reasons for

---

16. There is no evidence suggesting that the incident involving Santos was racially motivated.

17. The pervasive use of the word "nigger" in the workplace is supportive of a claim of

hostile work environment. *See Douglas v. J.C. Penney Co., Inc.*, 474 F.3d 10, 15 (1st Cir.2007). Booker, however, has not asserted such a claim.

[their adverse decision], let alone that those reasons masked racial discrimination." *Benoit v. Tech. Mfg. Corp.*, 331 F.3d at 174. It is true that Booker's workplace was not by any stretch an idyllic environment. However, Booker has failed to show that the defendants' actions, however insensitive or self-interested, were motivated by racial discrimination.[18] The court cannot "grant relief to a plaintiff who has been treated unfairly, even by the most irrational of managers, unless facts and circumstances indicate that discriminatory animus was the reason for the decision." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 64 (1st Cir.1999) (citation omitted). Booker's claims of racial discrimination necessarily fail.

### 2. Retaliation Claims

 Even in the absence of a viable discrimination claim, a claim of retaliation may survive under state and federal law. Title VII prohibits an employer from discriminating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3. To state a claim, Booker must show: (1) that she engaged in protected conduct; (2) that she was subject to an adverse employment action; and (3) that there was a causal connection between the protected conduct and the adverse action. *See Valentin–Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir.2006). To be "adverse," an employment action "must materially change the conditions" of a plaintiff's employment. *Gu v. Boston Police Dep't*, 312 F.3d 6, 14

(1st Cir.2002). Adverse employment actions include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *White v. New Hampshire Dep't of Corrs.*, 221 F.3d 254, 262 (1st Cir.2000) (citation omitted).

 The court agrees that Booker's letter of December 15, 2003, can be fairly read as an "opposition" to allegedly unlawful employment practices. *See Hernandez–Torres v. Intercont'l Trading, Inc.*, 158 F.3d 43, 47 (1st Cir.1998) (an "informal complaint" to an employer's personnel department constitutes "sufficient opposition."); *White*, 221 F.3d at 262 (same). The court, as previously indicated, is also of the view that Booker suffered one or more adverse employment actions as a result of her protests. Therefore, the court turns to defendants' proffered reasons for their actions.

Defendants aver that Nicosia removed the log book from the communications department in response to a complaint made by Santos on December 16, 2003, that Booker had altered the log to manipulate Santos' time records. Nicosia testifies (somewhat incredibly) that he had concluded that there was sufficient evidence of tampering, and thus decided to keep the log book in his office for "safe keeping." Next, defendants claim that Booker was subjected to a deduction of personal time because of previous uncorrected errors that she had made in filling out her timesheets. They also argue that prohibiting her from certifying payroll logs in which her name appeared was reasonable given these errors. Defendants maintain that

---

**18.** At bottom, Booker's accusation against McMullen is not that he was racist but that he was venal. Venality is not prohibited by Title VII or Chapter 151B. Nor for that matter is rudeness or insensitivity, qualities that both plaintiff and defendants seem to have exhibited.

Booker was relieved of her preferred police dispatching duties in order to make more efficient use of staff resources. They further note that this was done in December of 2004, ten months after Booker filed her MCAD charge. *See Bishop v. Bell Atl. Corp.*, 299 F.3d 53, 60 (1st Cir.2002) (a one-year gap between protected behavior and alleged retaliation insufficient to support a reasonable inference of causation); *Mesnick,* 950 F.2d at 829 (same, nine months). With regard to Booker's occasional assignment to the mailroom, defendants argue that Booker was the only employee at the Hospital who had mail room duties listed in her contractual job description. In addition, the mail room assignment was made in March of 2005, over a year after Booker filed her MCAD complaint. Finally, defendants claim that any problem that Booker perceives with the handling of her grievances is an issue to be addressed with her union.

■■■ While defendants' explanations seem generally plausible, when viewed in the light most favorable to Booker, there is sufficient evidence in the record to create a question of fact whether her complaints of discrimination caused her to be singled out as a target of retaliation. There is no doubt that Booker's relationship with Hospital management was provocative and contentious. But it is equally plausible that Nicosia was determined to punish Booker for her complaints. Accordingly,

Booker's claims for retaliation survive for trial.[19]

### 3. *Tortious Interference with Contract*

■■■ Booker alleges that Nicosia tortiously interfered with her employment contract with the Hospital. To prevail on such a claim, Booker "must demonstrate (1) that she had a business relationship, (2) that [Nicosia] knew of this relationship, (3) that [Nicosia] intentionally and maliciously interfered with the relationship, and (4) that she was harmed by [his] actions." *See Zimmerman v. Direct Fed. Credit Union,* 262 F.3d 70, 76 (1st Cir.2001) (citation omitted). Under Massachusetts law, a "defendant-supervisor is entitled to a qualified privilege in an employment-based tortious interference case (and, thus, will not be liable for employment decisions that are within the scope of his supervisory duties). The court adopted this limitation to allay a supervisor's fear of personal liability when the occasion arises for that supervisor to make an adverse employment decision on behalf of the employer." *Id.* (internal citation omitted). Accordingly, Nicosia can be held liable only if Booker proves that actual malice on Nicosia's part was the controlling factor in his disciplinary decisions. Because "it follows logically that the elements underlying a claim for unlawful retaliation may be used to show malice when a tortious interference claim is brought against a supervisor," *id.* at 77, the court

---

19. Massachusetts Chapter 151B allows for individual liability on an aiding and abetting theory. *See Beaupre v. Cliff Smith & Assocs.,* 50 Mass.App.Ct. 480, 491, 738 N.E.2d 753 (2000). There is no individual liability under Title VII. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1314–1317 (2d Cir.1995). Romary, Foley, Nicosia, and McMullen are each named in Count IV (state retaliation claim). Although Romary authorized two of the disciplinary punishments meted out to Booker, she has offered no evidence of a discriminatory animus on his part. The same is true of Foley.

Although McMullen is alleged to have harbored an intense dislike for Booker and to have engaged in offensive conduct, he was not a decision maker. Although Booker speculates that he may have influenced Nicosia's decisions, that alone is insufficient to establish liability. *See Bennett v. Saint–Gobain Corp.,* 507 F.3d 23, 31 (1st Cir.2007) ("[C]onjecture cannot take the place of proof in the summary judgment calculus."). Consequently, Romary, Foley, and McMullen will be dismissed from the case.

will leave to the jury the question of whether Nicosia was motivated by malice.

### ORDER

For the foregoing reasons, the motions for summary judgment are *ALLOWED* in part and *DENIED* in part. Summary judgment will enter in favor of defendants on Counts I, II, V, and VI. Judgment on Count III is *DENIED* as to the Hospital and EOHHS and as to Nicosia. In addition, per Booker's oral dismissal at the hearing, Counts VII and IX will be *DIS-MISSED* against all defendants, and Count VIII will be *DISMISSED* against all defendants but Nicosia. All claims against defendants Romary, Foley, and McMullen are *DISMISSED.*

SO ORDERED.