**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 13-1836

NEAL W. DIAS,

Plaintiff, Appellant,

v.

VERIZON NEW ENGLAND INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Torruella, Circuit Judge,
Souter,[*] Associate Justice,
Thompson, Circuit Judge.

Maria Mancini Scott, with whom Candida Marin Cote and Keches Law Group, P.C. were on brief, for appellant.
Timothy P. Van Dyck, with whom Robert G. Young, Nathanael J.C. Nichols, and Edwards Wildman Palmer LLP were on brief, for appellee.

June 5, 2014

---

[*]Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SOUTER, Associate Justice.**  Neal W. Dias, a former employee of Verizon New England Inc., appeals the district court's denial of his motion for a new trial, filed in the wake of a defendant's jury verdict on Dias's claim that Verizon discharged him and subjected him to a hostile work environment in retaliation for engaging in activity protected by Massachusetts anti-discrimination law.  Dias says that the jury instructions and verdict form were erroneous because they made no reference to a particular communication as being an example of protected activity. We hold that any error was necessarily harmless and affirm.

I.

Dias, "a black man of Cape Verdean descent," Appellant's Br. 2, worked for Verizon from 1997 to 2008, when he was let go in a company-wide reduction in workforce.  For his first seven years with Verizon, Dias worked as a lineman, and in 2004, he was promoted to the position of a first-level manager, as he remained until his discharge.  Late in that year, he swore at and allegedly threatened one of his colleagues, in an incident that prompted Verizon to give him a written warning and transfer him to a different work site.  Shortly after that, Dias filed an internal complaint with Verizon's Equal Employment Opportunity Office in which he asserted, among other things, that this disciplinary action constituted race-based discrimination. Verizon reviewed the matter and found the complaint meritless.

-2-

In 2006, for reasons unrelated to this case, Verizon transferred Dias to a different department, where he reported to second-level manager Paul McCarthy. After getting a lower rating from McCarthy in his 2006 year-end performance evaluation than his white colleague, Laurie McDonald, Dias complained to McCarthy's supervisor that his relatively low rating was the result of racial discrimination. He repeated the allegation in a Charge of Discrimination filed with the Massachusetts Commission Against Discrimination ("MCAD").

In October 2007, a Verizon technician was electrocuted while working on a telephone pole. Although Dias was not working that day, he was on call to respond to any emergencies, and after he learned of the accident he went to the scene to help. When he arrived, McDonald was there and was on the phone with McCarthy. McCarthy determined that his department had no role to play in the aftermath of the accident and ordered his people, including Dias and McDonald, to leave the area.

Three days later, Dias sent McCarthy a five-page, single-spaced e-mail written in some agitation, criticizing McCarthy's decision to direct him and the others to leave the scene of the accident. See Record Appendix ("R.A") 151-155. He accused McCarthy of being more concerned with ensuring that Verizon did not have to pay him for overtime work than with responding adequately to the death of the technician. The e-mail also voiced Dias's

displeasure at McCarthy's general treatment of him, and included considerable personal invective. See, e.g., id. at 154 ("I've had to deal with you calling me friggin pathetic when I call out ill, taking money from me and my family by not providing me with the raise and bonus I well deserved . . . and many other unethical performances."); id. ("What you did on [the day of the accident] was who you are and I have never been so disappointed and embarrassed for any one in my life . . . ."). Over the course of the e-mail, Dias used a cognate of the word "discriminate" five times, but he did not use the word "race," nor did he expressly assert a belief that race was behind McCarthy's perceived ill usage. See, e.g., id. ("Your treatment of me is . . . discriminating and out right [sic] disrespectful."). The e-mail closed by noting that Dias had submitted a time sheet for overtime pay and stating that "[i]f you refuse to pay me for my on call duty, that is you [sic] choice." Id. at 155.

Dias continued to work under McCarthy's supervision, and in December 2007 Dias complained to McCarthy that a co-worker insulted him with a pejorative, race-based comment. McCarthy promptly investigated the accusation, found it credible, and suspended the offending employee without pay. (The employee was reinstated nineteen days later as a result of negotiations between Verizon and the employee's union.) In February 2008, McCarthy gave Dias a positive performance evaluation, which resulted in a large

bonus, equivalent to roughly ten percent of Dias's base pay, and a salary increase.

Late in October 2008, McCarthy was directed to rate the performance of the first-level managers under his supervision for the purpose of determining which ones to let go in shrinking the workforce. He ranked Dias as the second worst out of five. At trial, McCarthy testified that he based his decision on Dias's failure to meet productivity goals, as well as McCarthy's sense that Dias was not a strong leader, not a team player, and not an engaged manager. Owing largely to this evaluation, Dias was among twelve first-level managers Verizon discharged.

## II.

Dias filed this action in the Superior Court of Massachusetts alleging, among other things, that he was terminated and subjected to a hostile work environment in retaliation for his complaints of race-based discrimination, in violation of Massachusetts law. See Mass. G. L. c. 151B § 4 ("It shall be an unlawful practice . . . [f]or any . . . employer . . . to discharge . . . any person because he has . . . filed a complaint" of racial discrimination.); Clifton v. Mass. Bay Transp. Auth., 839 N.E.2d 314, 318 (Mass. 2005) ("[U]nlawful retaliation . . . may . . . consist of a continuing pattern of behavior that . . ., by its insidious nature," amounts to a "hostile work environment.").

Verizon removed the action for jury trial in federal district court.

In anticipation of the charge conference, Dias and Verizon submitted proposed jury instructions on retaliation that were, for purposes here, materially identical. Both sets of proposed instructions mentioned examples of protected activity for which retaliation would be unlawful: Dias's February 2005 internal complaint to Verizon's EEO Office and his March 2007 claim of discrimination filed with the MCAD. See R.A. 76. Dias's proposed instruction, for example, read, "[Dias] claims that [Verizon] retaliated against him because he filed an internal EEO complaint, as well as an external complaint with the [MCAD]. . . . Your duty here is to assess whether [Dias's] lay off from Verizon was in retaliation for . . . asserting his rights by filing an internal complaint and then later filing a complaint with the [MCAD]." Id. Neither proposed instruction referred to Dias's October 2007 e-mail to McCarthy. At the charge conference, the district court announced that it would instruct the jury as Dias had requested, and the Court also circulated its proposed special verdict form, which included questions on retaliation tracking that instruction:

> Did [Verizon] terminate the employment of [Dias] [or subject him to a hostile work environment] because he engaged in protected activity (i.e. the filing of a complaint with Verizon's EEO Office in February, 2005 or a complaint with the MCAD in March, 2007)?

R.A. 87. Dias's counsel objected to the verdict form for failing to refer to the October 2007 e-mail, but she made it clear that her objection was limited to the form, and not directed at the court's adoption of her own proposed jury instruction on retaliation: "my question stems from the proposed verdict form, which I know we are not talking about now." R.A. 734. The court overruled the objection, stating that it "has reviewed the e-mail . . . , and has concluded that Mr. Dias does not clearly allege race-based discrimination, and that it is not, therefore, protected activity." R.A. 761.

The jury returned a verdict for Verizon, after checking the "no" box after the retaliatory termination and retaliatory hostile work environment questions on the verdict form. Dias moved for a new trial, complaining that the district court's jury instructions on retaliation and the verdict form "improperly precluded the jury . . . from finding that [Verizon] retaliated against Mr. Dias based on [the October 2007 e-mail]." R.A. 91. The district court denied the motion, and this appeal followed.

III.

The procedural posture of the appeal is bewildering at first sight, and although our discussion does not turn on any technical nicety, some clarification may help to explain how we reach the dispositive issue. A party's "notice of appeal must . . . designate the judgment, order, or part thereof being appealed,"

Fed. R. App. P. 3(c)(1)(B), and Dias's notice is limited to the district court's "Order . . . denying Plaintiff's Motion for a New Trial." R.A. 143. This would seem to indicate that our review is limited to determining whether the district court abused its discretion in denying Dias's motion for a new trial, without looking further back. See Latin Am. Music Co. v. Media Power Grp., Inc., 705 F.3d 34, 40 (1st Cir. 2013) ("We review the denial of a motion for a new trial for abuse of discretion.").

But Dias has no argument for a new trial that is not in fact an argument that there was error in the trial he had, and his object in purporting to appeal only the refusal to grant a new trial is presumably to draw attention away from the confusion of his approach to the submission to the jury of the underlying merits issues and his limited objection to it. Although he objected to the failure of the special findings questions to refer to the e-mail as protected conduct charging racial discrimination, those questions simply reflected the very jury instructions he requested and was granted, which spoke only of the internal and MCAD complaints as examples of protected conduct protesting mistreatment based on race. He never modified his request for instruction, did not object to the instructions as given and did not designate the instructions or special finding questions as a subject of appeal.

We do not, however, treat his designation of the new trial issue as excluding consideration of the antecedent objection

-8-

to the special finding questions, for the law in this Circuit is that Rule 3 should not be applied as artifice to avoid substance underlying the designated subject of appeal if clearly revealed. "Our precedents encourage us to construe notices of appeal liberally and examine them in the context of the record as a whole." Crawford v. Clark, 578 F.3d 39, 43 (1st Cir. 2009). Accordingly, we have several times excused imperfect notices of appeal where, as here, "both sides have fully briefed the merits, and undertaking appellate review of the original order . . . would not unfairly prejudice" the appellee. Id. (reviewing underlying judgment where notice of appeal only referred to appellant's motion for reconsideration of that judgment); Chamorro v. Puerto Rican Cars, Inc., 304 F.3d 1, 3 (1st Cir. 2002) (same); see also Torres v. Oakland Scavenger Co., 487 U.S. 312, 316 (1988) ("[T]he requirements [of Rule 3] should be liberally construed and mere technicalities should not stand in the way of consideration of a case on the merits" (internal quotation marks omitted)).

Accordingly, we reach Dias's claim of error in the special finding questions. We do not, however, resolve that claim on the merits, for even if we make the assumption that the refusal to include the e-mail reference in the verdict form was erroneous, any such error was harmless under the standard that an instructional error is reversible only when it affects "the essential fairness of the trial, or would have changed the

-9-

outcome." Allen v. Chance Mfg. Co., Inc., 873 F.2d 465, 469 (1st Cir. 1989) (internal quotation mark omitted); see Fed. R. Civ. P. 61 ("courts must disregard all errors and defects that do not affect any party's substantial rights"); O'Neal v. McAninch, 513 U.S. 432, 441 (1995) (suggesting that the civil and criminal harmless-error standards are the same).

Here, even assuming that the October 2007 e-mail was activity protected under a state law, it is clear that no rational, properly instructed jury could find that Verizon fired Dias in retaliation for sending it. To start with, Verizon's decision to discharge Dias was made more than a year after the e-mail, an interval that we have repeatedly indicated is generally too long to support a reliable inference of cause between protected conduct and adverse employment action. See, e.g., Benoit v. Technical Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003) (affirming summary judgment for employer on federal retaliation claim where protected conduct occurred more than one year before employee's termination); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) (same, for gap of nine months); Bishop v. Bell Atlantic Corp., 299 F.3d 53, 60 (1st Cir. 2002) (reversing judgment of the verdict for employee on retaliation claim under Maine law, where one-year gap was too great for finding "the required nexus" showing retaliation). And, to the extent that causation may ever be inferred despite a substantial delay between the protected conduct

-10-

and the retaliation claimed, this would only be where the record contains some other evidence of an employer's retaliatory animus during the intervening time, casting a light of revenge on what the employer did. See Bishop, 299 F.3d at 60. There is nothing of the sort in this record, though. Less than two months after the e-mail, McCarthy responded decisively to Dias's complaint that a co-worker had taunted him with a racist comment; after an immediate investigation, McCarthy suspended the offending employee without pay. More telling still, a few months after this incident, McCarthy gave Dias a favorable 2007 year-end performance evaluation, from which ensued not only a large bonus on top of his 2007 base salary, but also a raise for 2008. These are not the actions ordinarily expectable from someone bent on revenge. See Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 101 (1st Cir. 2007) (intervening salary increase and positive performance evaluation suggest adverse action unrelated to protected activity).

The same work history belies Dias's claim that Verizon retaliated by subjecting him to a hostile work environment. Dias would have to show that he suffered "severe or pervasive harassment in retaliation for engaging in protected activity," Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005); see also Clifton v. Mass. Bay Transp. Auth., 839 N.E.2d 314, 318 (Mass. 2005), whereas in this appeal he described no specific "severe or pervasive" treatment at Verizon, let alone evidence of its

retaliation for the e-mail.  We are at a loss to see any way that the district court's reference to the e-mail in its jury instructions or verdict form could have altered the jury's verdict.

## IV.

The judgment of the district court is AFFIRMED.